Hillsborough-northern judicial district
No. 2011-258

# THE STATE OF NEW HAMPSHIRE

v.

# CHRISTOPHER GRIBBLE

Argued: November 8, 2012
Opinion Issued: May 7, 2013

4

*Michael A. Delaney*, attorney general (*Jeffery A. Strelzin*, senior assistant attorney general, and *Peter Hinckley*, assistant attorney general, on the brief, and *Mr. Hinckley* orally), for the State.

*Stephanie Hausman*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

BASSETT, J. The defendant, Christopher Gribble, appeals his convictions, following a jury trial, for first-degree murder, attempted murder, conspiracy to commit first-degree murder, witness tampering, and conspiracy to commit burglary. *See* RSA 626:8 (2007); RSA 630:1-a (2007); RSA 629:1 (2007); RSA 629:3 (2007); RSA 641:5 (2007); RSA 635:1 (2007). On appeal, he argues that the Superior Court (*Abramson*, J.) erred when it: (1) denied his motion to suppress; (2) denied his motions for a change of venue; and (3) instructed the jury concerning insanity. We affirm.

The defendant's convictions arise out of a home invasion in Mont Vernon that he and three other individuals carried out in the early morning hours of October 4, 2009, which resulted in the death of Kimberly Cates. The defendant was charged with alternate counts of first-degree murder, alleging that, acting in concert with, and aided by, Steven Spader, he purposely or knowingly caused the death of Cates by attacking her with a knife. He was also charged with attempted murder of Cates' daughter, witness tampering, and conspiracy to commit murder and burglary. The defendant pleaded not guilty by reason of insanity. The jury found him sane and guilty of all of the charges. This appeal followed.

On appeal, the defendant argues that the trial court erred in denying his motion to suppress statements he made to the New Hampshire State Police that he claimed were obtained in violation of his right to remain silent. He further contends that the court erred in denying his motions for a change of venue. He argues that a venue change was necessary due to the extensive amount of pretrial publicity regarding the crimes and the earlier trial of Steven Spader. Finally, he asserts that the court erroneously instructed the jury regarding insanity. We address each argument in turn.

## I. Suppression

The following facts are drawn from the trial court's order on the defendant's motion to suppress and the record, or are otherwise undisputed. On October 5, 2009, Troopers John Encarnacao and Jeffrey Ardini of the New Hampshire State Police interviewed the defendant at the New Hampshire State Police Troop B barracks in Milford regarding Cates' murder and the related crimes. At the outset of the interview, Trooper Encarnacao confirmed with the defendant that his presence at the barracks was voluntary and that the interview would be recorded. He further advised the defendant of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). The defendant stated that he understood his rights and agreed to answer questions. The troopers then questioned the defendant about his recent activities.

After approximately an hour, the recording device malfunctioned. When the interview resumed using a replacement audio recorder, Trooper Ardini asked the defendant if he remembered his *Miranda* rights. The defendant responded that he did. At that point, the troopers resumed questioning the defendant. They accused him of participating in the home invasion and the attack on Cates and her daughter. The defendant maintained that he could not recall everything that he had done during the preceding forty-eight hours, but he denied participating in the crimes.

As the interview progressed, the troopers employed various tactics to elicit an admission from the defendant concerning his involvement in the crimes. They expressed skepticism at his memory loss and told the defendant that they did not believe him because his friends had inculpated him in the crimes. They repeatedly told the defendant that what he had told them did not match what his friends were saying and that this was his opportunity to tell the truth and explain "why this happened." For instance, at one point Trooper Ardini said to the defendant:

> [Trooper Encarnacao] and I just want to know *the why*, the how. It's not just crime, suspect, done. Come on. You think the lawyers that we deal with are going to take that? No. *They want to know*

*the why* because it totally changes the story. . . . *We try to answer the whys* and the whos but when there's more than one person you need to start looking out for yourself. *And that's where the why comes in.* That's why [we] are still in this room with you. We're here for you we want to give you the time. We understand it is not, it goes against everything in our inner instinctual mannerisms to admit any connection to this whole thing. Any. Even if you just drove to the general area and the people got out and they did whatever it is they did, you don't know whatever, it just goes against every instinct that we have in our bodies to say that because there's consequences to it. We're not bull****ting you, there's consequences. *But the consequences are vastly different depending on the why.* And that's why we're here. . . . *We want to help you paint that picture that helps explain your why before they paint it for you.*

(Emphases added.) He later told the defendant:

You know those guys are giving stuff up and you know what they're giving up is matching what we already know. I don't know how else to tell you. *This is your chance to give your version of why. Because the why is what's going to explain it and change the perception of this whole thing* specifically of you. We can only throw you the rope man. We can only throw you the rope. You got to grab it.

(Emphasis added.) Trooper Encarnacao subsequently told him that "[t]he door is closing on your opportunity to explain *why this happened.*" (Emphasis added.)

Despite the troopers' persistent exhortations to tell the truth and explain what happened, the defendant continued to profess his innocence. He challenged the evidence that the troopers claimed connected him to the crime, and further questioned why, if the troopers had such evidence, they had not already arrested him. After two and a half hours, Trooper Encarnacao stopped the interview to give everyone a break.

Approximately twenty minutes later, the troopers resumed the interview. Trooper Ardini again asked the defendant if he remembered and understood his *Miranda* rights. The defendant said that he did and that he wanted to help with the investigation. The troopers then continued to confront him with information they had about the crimes. Shortly thereafter, the following conversation took place:

[The defendant]: (inaudible) I don't have to say anything.

[Trooper Encarnacao]: You don't.

[The defendant]: So I don't want to.

[Trooper Encarnacao]: What?

[The defendant]: So I won't.

[Trooper Ardini]: What does that mean Chris?

[The defendant]: I have a right not to say anything.

[Trooper Ardini]: That's true.

[The defendant]: So I won't say anything.

[Trooper Encarnacao]: So what you're saying is you don't want to talk to us any longer? You have to speak.

[The defendant]: Yes.

[Trooper Encarnacao]: This interview is over then?

[Trooper Ardini]: At Chris's request we are ending the interview and the recording. The time by my watch is 17:26.

At that time, the troopers turned off the recording equipment and ceased all questioning. Before Trooper Encarnacao left the interview room, the defendant said "something to the effect that he was just tired, that he's sorry, he doesn't feel like talking anymore." Trooper Encarnacao told him, "[H]ey, that's your prerogative, you don't want to talk, that's fine, you don't have to."

The defendant was then left alone in the interview room while Trooper Encarnacao alternated between sitting at a desk directly outside the interview room and speaking with other investigators about the case in another room at the barracks. At no point did the defendant request to leave. After about an hour, the defendant leaned forward and beckoned to Trooper Encarnacao, indicating that he wanted to speak with him. Trooper Encarnacao moved to the doorway of the interview room.

Trooper Encarnacao then had what he described as "several separate conversations" with the defendant in the span of fifteen to twenty minutes. The defendant first asked him "if everybody was still there," and he told the defendant that he was not sure because he had spent the afternoon with the defendant. Trooper Encarnacao further told the defendant that it had been a long day and that he was tired. The defendant agreed and began talking about his family. The defendant then asked Trooper Encarnacao if his job was hard. Trooper Encarnacao responded that it was. The defendant continued to question the trooper about his job and whether it was "hard to deal with." Trooper Encarnacao responded, "[Y]ou know, at times it is, but it's like any other job, you take the good with the bad." The defendant "said something to the effect that [Trooper Encarnacao] must see a lot, that must

be hard to deal with," to which Trooper Encarnacao responded, "it can be, but, *you know, the real thing that's hard to deal with is when you, you know, can't find the answers why something happens.*" (Emphasis added.)

The defendant then brought up the subject of the death penalty, asking Trooper Encarnacao whether the crimes under investigation were eligible for the death penalty. Trooper Encarnacao told him that he did not think so and then explained what crimes were eligible for the death penalty. The defendant also asked about the difference between first and second-degree murder, and Trooper Encarnacao explained the difference.

Following this conversation, Trooper Encarnacao testified that the defendant said, "you know what, why don't you go get your recorder . . . I'll tell you everything." Trooper Encarnacao testified that he was surprised by the defendant's statement because, in his mind, the interview was over, and the defendant had already decided not to tell the troopers anything else. Trooper Encarnacao reminded the defendant that he did not have to talk, but the defendant said, "[N]o, you know, I'm going to tell you everything." Trooper Encarnacao told the defendant that he had to retrieve his audio recorder and locate Trooper Ardini. The defendant stated that he did not want to speak with Trooper Ardini, but that he trusted Trooper Encarnacao. Trooper Encarnacao then retrieved an audio recorder and returned to the interview room. He testified that he asked the defendant "if he wanted to do this," and the defendant "said he did."

Trooper Encarnacao then began recording. The following conversation ensued:

> [Trooper Encarnacao]: And this is a continuation of [an] interview that we ended maybe forty five minutes or so ago. Ah it might have been a little longer. At your request we had been speaking with ah, well it was Chris and I and Trooper Jeff Ardini from the Major Crime Unit at that time. Ah and again we were, we were interviewing Chris and at some point Chris said that he didn't feel like talking anymore. Ah is it true you've come to me and you've told me you'd like to talk again?
>
> [The defendant]: Yes I would.

Thereafter, Trooper Encarnacao again read the defendant his *Miranda* rights. The defendant said that he understood his rights and he further agreed to speak with Trooper Encarnacao and answer questions. The defendant then confessed to his involvement in the crimes.

Before trial, the defendant moved to suppress his confession, arguing, in part, that his right to remain silent was violated because, after he had asserted this right, Trooper Encarnacao conducted "the functional equiva-

lent of interrogation which [led] back to a recorded formal interrogation." Following a hearing, the trial court denied the defendant's motion. The court found that, once the defendant invoked his right to remain silent, Trooper Encarnacao neither expressly interrogated the defendant nor conducted the functional equivalent of interrogation. Rather, the court found that the "defendant's statements were initiated *solely* by him, without *any* prompting by the police." (Quotation omitted.) Accordingly, the court ruled that the defendant's confession was not obtained in violation of his right to remain silent.

On appeal, the defendant argues that his rights under Part I, Article 15 of the New Hampshire Constitution and the Fifth and Fourteenth Amendments to the United States Constitution were violated. Specifically, he contends that Trooper Encarnacao engaged in the functional equivalent of interrogation and, as a result, failed to "scrupulously honor" his invocation of his right to remain silent. We first address the defendant's claim under the State Constitution and rely upon federal law only to aid in our analysis. *State v. Ball*, 124 N.H. 226, 231-33 (1983).

Whether the defendant was subjected to interrogation is a mixed question of law and fact. *State v. Spencer*, 149 N.H. 622, 625 (2003). Thus, we defer to the trial court's factual findings with respect to interrogation unless they are contrary to the manifest weight of the evidence. *Id.* However, we conduct a *de novo* review of the trial court's ultimate determination of whether interrogation occurred. *Id.*

Before the defendant's responses made during custodial interrogation may be used as evidence against him, the State must prove, beyond a reasonable doubt, that it did not violate his constitutional rights under *Miranda. See, e.g., id.* at 624; *State v. Jeleniewski*, 147 N.H. 462, 465 (2002). In *Miranda*, the Supreme Court held that if an accused is in police custody, has been informed of his *Miranda* rights, and "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74.

Subsequently, in *Michigan v. Mosley*, 423 U.S. 96, 101-04 (1975), the Supreme Court addressed the circumstances under which interrogation may be lawfully resumed after a defendant has invoked his *Miranda* rights. The Court found that nothing in *Miranda* could "sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." *Mosley*, 423 U.S. at 102-03. Relying upon the "right to cut off questioning" as enunciated in *Miranda*, the Court concluded "that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether

his 'right to cut off questioning' was 'scrupulously honored.' " *Id.* at 103-04. We have similarly concluded that whenever a suspect in custody exercises his option to cut off questioning, the police must scrupulously honor the suspect's desire to remain silent. *State v. Laurie*, 135 N.H. 438, 442 (1992).

■ Nevertheless, the defendant himself may initiate further conversation and thereby waive the right he had previously invoked. *See State v. Plch*, 149 N.H. 608, 616 (2003); *State v. Elbert*, 125 N.H. 1, 9 (1984). In those instances, the State must prove beyond a reasonable doubt that the defendant, without improper prompting, initiated conversation with the police about the subject of the charges. *See Plch*, 149 N.H. at 616. Thus, the defendant — even after he has asserted his right to remain silent — may choose to initiate further conversation with the police, and his subsequent statements may be admissible so long as his decision is not the result of improper prompting by the police. *See Plch*, 149 N.H. at 616; *cf. United States v. Alexander*, 447 F.3d 1290, 1294 (10th Cir. 2006) (stating that "a defendant — even if he has asserted the right to counsel — may choose to reinitiate contact with the police so long as the government does not coerce him into doing so").

Here, the defendant does not dispute that, after he invoked his right to remain silent, he initiated the conversation with Trooper Encarnacao "in the ordinary dictionary sense of that word." *State v. Gravel*, 135 N.H. 172, 177 (1991) (quotation omitted). Nor does he assert that any of his statements were involuntary. Rather, he argues that Trooper Encarnacao's responses to his questions constituted the functional equivalent of interrogation because they were not confined to answering the defendant's questions but "directly alluded to the prior interrogation" regarding the crimes, and, therefore, that these responses improperly prompted him to confess. We disagree.

■ Interrogation for *Miranda* purposes occurs when "a person in custody is subjected to either express questioning or its functional equivalent." *Spencer*, 149 N.H. at 625 (quotation omitted). The functional equivalent of interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). The "functional equivalent" aspect of the term "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Plch*, 149 N.H. at 614 (quotation omitted). "This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an

added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police." *Innis*, 446 U.S. at 301.

██ ██ Trooper Encarnacao's responses to the defendant's questions did not constitute the functional equivalent of interrogation. Courts have held that a police officer's responses to certain inquiries by the defendant do not constitute interrogation. *Spencer*, 149 N.H. at 625 (citing and discussing cases). In *Spencer*, for instance, we held that the officer's conduct of showing the defendant bank surveillance photographs of a person who appeared to be the defendant was done in response to the defendant's apparent confusion about being arrested and did not constitute interrogation. *Id.* at 626. Similarly, in *United States v. Conley*, 156 F.3d 78, 83 (1st Cir. 1998), the court found that the officer's "comments regarding the facts of the case and the strength of the evidence" were made "in direct response to the [defendant's] importuning," and could "hardly be classified as interrogatory." Here, as in those cases, Trooper Encarnacao's statements to the defendant were made in direct response to the defendant and cannot be characterized as interrogatory.

We are not persuaded by the defendant's argument that Trooper Encarnacao "invited [the defendant] to re-engage in a conversation about the crimes" by his response that the hardest part of his job was when he was unable to find answers as to why a crime occurred. It is true that during their previous conversation with the defendant the troopers had referenced the need to know why the crime occurred; however, this fact alone does not support a conclusion that Trooper Encarnacao's response effectively "turned the conversation back to the investigation of the Mont Vernon crimes." To the contrary, Trooper Encarnacao's response materially differs from statements that we have found to be the functional equivalent of interrogation in other cases. *See Plch*, 149 N.H. at 614-15; *Gravel*, 135 N.H. at 177 (officer's questions pertaining to the location where defendant had said he used drug were asked only to elicit incriminating evidence and, thus, constituted interrogation). For example, in *Plch*, the defendant was suspected of the murder and dismemberment of a woman. *Plch*, 149 N.H. at 610. During an interview with the police, he invoked his right to counsel. *Id.* at 611-12. Subsequently, the interviewing officer told the defendant that if he had "a change of heart and . . . want[ed] to stand up and be the man [he] want[ed] to be" and let the police know where the victim's body parts were, then he would have to tell somebody that he wanted to speak with the detectives because they could no longer speak with him. *Id.* at 612 (quotation omitted). We found that the police should have known that these "statements were reasonably likely to evoke an incriminating response

from the suspect," *id.* at 614 (quotation and brackets omitted), and that they were intended to persuade the defendant to "have a change of heart" and tell the detectives where the body parts were, *id.* at 615 (quotation omitted). *See also State v. Dellorfano,* 128 N.H. 628, 634 (1986) (finding that officer called out defendant's nickname in the jail cell area in order to elicit an incriminating answer); *State v. Beaupre,* 123 N.H. 155, 158 (1983) (finding detective's invitation to the defendant to make a statement constituted custodial interrogation in violation of defendant's right to counsel under *Miranda*). Here, we cannot say that Trooper Encarnacao should have known that his response was reasonably likely to elicit a confession from the defendant regarding his involvement in the crimes.

The defendant further suggests that Trooper Encarnacao's response was meant to appeal to the defendant's "interest in police work that had been apparent from the beginning of their interaction." We disagree. The defendant asked Trooper Encarnacao a series of questions regarding the difficulty of his job, and the trooper directly responded by explaining what he found to be the hardest part of his job. *See Spencer,* 149 N.H. at 626.

█ The defendant contends that he made earlier attempts to discontinue questioning but that the troopers nonetheless continued to question him before the interview ended. He maintains that his "perceptions of the troopers' willingness to continue questioning him in the face of his initial, equivocal attempts to discontinue questioning are relevant to how he would perceive the later interaction with [Trooper] Encarnacao." We agree that, in determining whether Trooper Encarnacao conducted the functional equivalent of interrogation, we focus primarily on the defendant's perceptions. *See Plch,* 149 N.H. at 614 (quotation omitted). Here, however, although the troopers continued to question the defendant despite his "equivocal attempts to discontinue questioning," once the defendant unequivocally asserted his right to remain silent, the troopers immediately ended the interview and left the defendant alone in the interview room. After the defendant was left alone in the interview room, there is no evidence that he had any other conversations with the troopers until *he* later initiated contact with Trooper Encarnacao. In light of these facts, we fail to see how the defendant would perceive Trooper Encarnacao's later responses to the defendant's questions as the functional equivalent of interrogation.

Moreover, there was no reason for Trooper Encarnacao to believe that the defendant would suddenly decide to admit his involvement in the crimes. The troopers had interviewed the defendant for nearly four hours, during which time they repeatedly accused him of committing the crimes, and the defendant repeatedly professed his innocence. As a result, Trooper Encarnacao could have reasonably concluded that the defendant would

continue to profess his innocence. *See Spencer*, 149 N.H. at 626. This is evidenced by Trooper Encarnacao's testimony that he was surprised by the defendant's willingness to tell him everything as he thought the interview had ended and that the defendant was not going to tell them anything else. Although Trooper Encarnacao's intent is not conclusive, it is relevant to determining whether his response constituted the functional equivalent of interrogation. *See id.*

Accordingly, we hold that Trooper Encarnacao did not engage in the functional equivalent of interrogation. It follows, therefore, that he did not improperly prompt the defendant to initiate the further conversation. *See Plch*, 149 N.H. at 615-16. Rather, the ensuing conversation was "initiated *solely* by [the defendant], without *any* prompting by the police." *Id.* (quotation omitted). Thus, the defendant's *Miranda* rights were not violated, and we find no error in the trial court's denial of his motion to suppress. *See Innis*, 446 U.S. at 300 (explaining that "[v]olunteered statements of any kind are not barred by the Fifth Amendment" (quotation omitted)); *see also State v. Reynolds*, 124 N.H. 428, 433 (1984) ("By voluntarily initiating the discussion . . . the defendant exercised the control over the questioning that the constitution guarantees him.").

■ Finally, the defendant contends that we should find the State Constitution more protective than the Federal Constitution with respect to "suspects who give statements after invoking their right to silence." He maintains that in deciding certain cases, such as those addressing whether there has been a valid waiver of *Miranda* rights, we have viewed the State Constitution as more protective than the Federal Constitution. We have historically mandated, under our State Constitution, more protection of a suspect's *Miranda* rights than has the United States Supreme Court under the Federal Constitution. *See Gravel*, 135 N.H. at 184. However, to the extent that the defendant is inviting us to provide greater protection under the State Constitution than is already given, he has failed to adequately develop an argument as to why we should now expand that protection. We, therefore, decline his invitation. *See State v. Euliano*, 161 N.H. 601, 608 (2011) (declining to address defendant's argument that trial judge was not impartial under Part I, Article 35 of State Constitution and Sixth Amendment to United States Constitution because defendant had failed to adequately develop it).

As the Federal Constitution offers the defendant no greater protection than the State Constitution does under these circumstances, *see Plch*, 149 N.H. at 620; *Spencer*, 149 N.H. at 629; *Innis*, 446 U.S. at 300-02, we reach the same result under the Federal Constitution as we do under the State Constitution.

*II. Venue*

The defendant next argues that the trial court erred by denying his motions to change venue. The crimes in this case generated an extensive amount of media coverage. While much of the coverage occurred immediately after the crimes, co-conspirator Spader's trial and sentencing in November 2010, approximately four months before the defendant's trial, engendered numerous newspaper articles and editorials as well as daily television coverage. Many of those articles identified Spader and the defendant as being accused of Cates' murder and the attempted murder of her daughter. One article described the start of Spader's trial under the headline, "Jurors slated to visit site of grisly murder." Several articles quoted the prosecutor's opening argument, which included a graphic description of the attack and the defendant's involvement. Media accounts of Spader's trial also related the testimony of Quinn Glover, one of the co-conspirators who participated in the home invasion, in which he said that he saw "Gribble [take] his knife and . . . put it on the right side of [Cates'] throat. I turned my head away . . . when I looked back the knife was on the other side of her throat." (Parenthesis omitted.) Other articles set forth testimony describing how the defendant stabbed Cates' daughter. Another article explained that the defendant was accused of slashing Cates' throat and throwing her daughter into a sliding glass door. Several articles discussed citizens' reactions to the crimes under headlines such as "Trial creates uneasy note for many" and "Spader murder trial testimony stokes public anxiety."

Following Spader's conviction in November 2010, the news media shifted its focus to the defendant's case. At least one article reported that the defendant sought to suppress his confession. Several articles and a local television station later reported that the defendant admitted that he committed the crimes charged but had pleaded not guilty by reason of insanity. In addition, a few articles included comments by legal and mental health professionals on the viability of the insanity defense.

Before trial, the defendant filed two motions requesting a change of venue. In the first motion, he argued that "[t]he volume of adverse and hostile publicity generated during the trial and sentencing of" Spader required the court to presume prejudice in advance of jury *voir dire*. He further maintained that, if the court denied his change of venue request, it should consider the use of "supplemental questionnaires to ascertain the true scope of the potential juror's exposure to pretrial publicity and that publicity's impact on that potential juror." The trial court denied his motion, finding that "the pretrial publicity surrounding the *Spader* trial was not so inherently prejudicial to justify a change of venue," and, given that "the

issues raised in *Spader* [were] remarkably different from those [the] defendant raise[d]," the defendant had failed "to illustrate how the alleged inflammatory news coverage from the *Spader* trial prejudices the jury pool in his trial." The court also denied his request for a supplemental juror questionnaire.

After the jury was selected, the defendant renewed his motion to change venue. He argued that "the jury selection process [had] revealed that the adverse pretrial publicity in this case created fear, bias and widespread discussion of the case in the community such that the jurors' claims that they [could] be impartial cannot be believed." The court again denied his request, finding that he had "not met his heavy burden of establishing inherent or presumptive prejudice from the pretrial publicity this case garnered" and had "failed to establish any bias or actual prejudice in the jury panel seated, such that he [could not] obtain a fair trial."

On appeal, the defendant argues that the court erred by denying his motions because "the overwhelming media coverage and intensely antagonistic community sentiment" denied him "a fair determination of his sanity and criminal responsibility . . . in Hillsborough County." Although he bases his claim on both the State and Federal Constitutions, he relies primarily upon federal law, and does not argue for a higher standard under the New Hampshire Constitution. We first address the defendant's arguments under the State Constitution and rely upon federal law only to aid in our analysis. *See Ball*, 124 N.H. at 231-33.

Part I, Article 17 of the New Hampshire Constitution provides:

> In criminal prosecutions, the trial of facts, in the vicinity where they happened, is so essential to the security of the life, liberty and estate of the citizen, that no crime or offense ought to be tried in any other county or judicial district than that in which it is committed; except in any case in any particular county or judicial district, upon motion by the defendant, and after a finding by the court that a fair and impartial trial cannot be had where the offense may be committed, the court shall direct the trial to a county or judicial district in which a fair and impartial trial can be obtained.

We have explained that Part I, Article 17 grants a criminal defendant the right to be tried where the crime was committed and the right to obtain a change of venue upon proof that he cannot obtain a fair trial there. *Petition of State of N.H. (State v. Johanson)*, 156 N.H. 148, 154 (2007). Similarly, the United States Supreme Court has ruled that under the Federal Constitution, "a defendant *must* be given an opportunity to show that a change of

venue is required in his case" because of community prejudice. *Id.* (quotation omitted). In addition, the due process requirements of Part I, Article 15 of the New Hampshire Constitution and the Sixth Amendment to the United States Constitution guarantee a defendant the right to a trial by a fair and impartial jury. *State v. Smart*, 136 N.H. 639, 646 (1993); *Groppi v. Wisconsin*, 400 U.S. 505, 509 (1971); *see also* N.H. CONST. pt. I, art. 35 ("It is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit."). Thus, if there is proof of community prejudice such that the defendant cannot receive a trial by a fair and impartial jury in the county where the crime was committed, the defendant has an absolute right to a change of venue. *See Petition of State of N.H. (State v. Johanson)*, 156 N.H. at 154; *see also Skilling v. United States*, 130 S. Ct. 2896, 2913 (2010) ("The Constitution's place-of-trial prescriptions ... do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial — a basic requirement of due process." (quotation omitted)).

 Publicity about a case can result in two types of prejudice with regard to the defendant's right to a fair trial. *State v. Laaman*, 114 N.H. 794, 798 (1974). The first is inherent or presumptive prejudice, which exists when the publicity by its nature has so tainted the trial atmosphere that it will necessarily result in a lack of due process. *Id.*; *see Smart*, 136 N.H. at 647. A claim of inherent prejudice does not require the defendant to show "actual identifiable prejudice." *Smart*, 136 N.H. at 647 (quotation omitted). The second type of prejudice is actual prejudice which exists when the publicity has infected the jurors to such an extent that the defendant cannot receive, or has not received, a fair and impartial jury trial. *Laaman*, 114 N.H. at 798. In this situation, the defendant must show that the nature of the opinions formed by the jurors as a result of the publicity are such that they cannot be set aside to enable them to render a verdict based upon the evidence presented in court. *Id.*; *see also Irvin v. Dowd*, 366 U.S. 717, 723 (1961). Here, the defendant maintains that presumed or inherent prejudice resulted from the pretrial publicity and that "the community interest" was such that "the jurors' assurances of impartiality must be doubted."

 The trial court's determination of the impartiality of the jurors selected, essentially a question of demeanor and credibility, "is entitled to special deference." *Smart*, 136 N.H. at 653 (quotation and ellipsis omitted). This is so in particular "with respect to pretrial publicity" as "[t]he judge of that court sits in the locale where the publicity is said to have had its effect, and brings to his evaluation of any such claim of prejudice his own perception of the depth and extent of news stories that might influence a

juror." *Id.* (quotation and brackets omitted); *Skilling*, 130 S. Ct. at 2918 ("When pretrial publicity is at issue, primary reliance on the judgment of the trial court makes especially good sense." (quotation and brackets omitted)). As a result, we have said "that the trial court's finding that a jury was impartial should only be overturned for manifest error." *Smart*, 136 N.H. at 647. Because neither party argues that a different standard of review should apply, we will review the trial court's decisions in this case for manifest error.

### A. Pretrial Publicity

The defendant first contends that the pretrial publicity surrounding the Spader trial and leading up to his trial resulted in presumptive prejudice requiring a change of venue even before the trial court conducted *voir dire*. We disagree.

The seminal case for examining whether presumptive prejudice resulted from pretrial publicity is *Rideau v. Louisiana*, 373 U.S. 723 (1963). *See Skilling*, 130 S. Ct. at 2913. In *Rideau*, the defendant was charged with armed robbery, kidnapping, and murder in a small parish in Louisiana. *Rideau*, 373 U.S. at 724. On the morning after the crimes, in the absence of defense counsel, the police interrogated the defendant in jail and obtained his confession. *Id.* at 724, 727. The interrogation was filmed and later broadcast on three separate occasions prior to trial by a television station in the parish where the crimes were committed, to an audience of between 20,000 and 53,000, in a community which had a population of approximately 150,000. *Id.* at 724.

The United States Supreme Court reversed the denial of the defendant's motion for a change of venue, stating that "[w]hat the people of [the] . . . Parish saw on their television sets was [the defendant], in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the [crimes], in response to leading questions by the sheriff." *Id.* at 725. The Court explained that "to the tens of thousands of people who saw and heard it, [this was] in a very real sense . . . [the defendant's] trial — at which he pleaded guilty to murder." *Id.* at 726. Based upon these facts, the Court found that "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality," *id.*, and, as a result, "without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury," the Court held that the denial of the defendant's motion to change venue violated his right to due process of law. *Id.* at 727.

More recently, in *Skilling*, the Supreme Court addressed a claim of presumed juror prejudice resulting from "pretrial publicity and community prejudice" against the defendant. *Skilling*, 130 S. Ct. at 2907. The

defendant, a longtime Enron executive, had been prosecuted "for crimes committed before the corporation's collapse." *Id.* He claimed that the trial court erred in failing to move his trial to a different venue because "the community passion aroused by Enron's collapse and the vitriolic media treatment aimed at him" created a presumption of prejudice. *Id.* at 2912 (quotation omitted).

The Supreme Court began its analysis by reviewing *Rideau* and other cases in which it "overturned a conviction obtained in a trial atmosphere that was utterly corrupted by press coverage." *Id.* at 2914 (quotation and brackets omitted). The Court explained that those "decisions . . . cannot be made to stand for the proposition that juror exposure to news accounts of the crime alone presumptively deprives the defendant of due process." *Id.* (quotation and ellipses omitted). "Prominence does not necessarily produce prejudice, and juror *impartiality*," the Court reiterated, "does not require *ignorance*." *Id.* at 2914-15. The Court then considered certain factors, *id.* at 2915-17, in making its determination that the defendant's trial shared "little in common with those in which [it] approved a presumption of juror prejudice," *id.* at 2916.

The defendant argues that we should consider several of the factors enumerated in *Skilling* in addressing his claim, specifically: (1) the size of the community and the pervasiveness of the media coverage; (2) the nature of the reporting; (3) the timing of the trial in relation to the crime; and (4) the effect of the media coverage surrounding Spader's trial. *See id.* at 2915-17. Upon consideration of these factors, we conclude that the trial court did not commit manifest error when it determined that the pretrial publicity did not create a presumption of prejudice sufficient to require a change of venue.

### 1. Size of the Community and Pervasiveness of the Media Coverage

In this case, the jury was drawn from Hillsborough County, the most populous county in New Hampshire, with a population of over 400,000. *See Hillsborough County*, N.H. Employment Sec. (2012), *available at* http://www.nhes.nh.gov/elmi/products/cp/documents/hillsborough-cp.pdf. Although Hillsborough County is not as large as the community in *Skilling*, where the jury was drawn from a population with over 4.5 million eligible jurors, *id.* at 2915, it is significantly more populous than communities in which prejudice has been presumed, *see Rideau*, 373 U.S at 724 (presumed prejudice found where prospective jurors drawn from parish with population of 150,000 residents); *Irvin*, 366 U.S. at 719 (presumed prejudice found where prospective jurors drawn from rural county of approximately 30,000 residents); *Com. v. Toolan*, 951 N.E.2d 903, 915 (Mass. 2011) (finding that

"[t]he small size of the Nantucket community [with a population of just over 10,000 permanent residents] weighs in favor of finding local prejudice").

The defendant raises concerns about the impact that the crimes had on the community, citing articles quoting a few residents who expressed anger, bewilderment and heartbreak over the crimes. The defendant fails to demonstrate, however, how the sentiment expressed by a small number of residents in a county with over 400,000 residents is indicative of presumed prejudice in the potential jury pool. *Cf. United States v. Mitchell*, 752 F. Supp. 2d 1216, 1221 (D. Utah 2010) (finding the fact that nine to ten thousand community volunteers were involved in the search for kidnapping victim in a county with a population of 2.8 million did not support presumption of prejudice); *United States v. McVeigh*, 918 F. Supp. 1467, 1472 (W.D. Okla. 1996) (change of venue necessitated, in part, by community sentiment, which included public sympathy for the victims as demonstrated by memorials displayed in the state capitol building and t-shirts honoring the victims sold in the courthouse on hearing days). Thus, given the size of the community from which the jury pool was drawn in this case, it is unreasonable to conclude that twelve impartial jurors could not be found. *See Skilling*, 130 S. Ct. at 2915; *see also United States v. Diehl-Armstrong*, 739 F. Supp. 2d 786, 793-94, 807 (W.D. Pa. 2010) (finding no presumed prejudice, in part because jury drawn from community with total population of 545,615); *Com. v. Entwistle*, 973 N.E.2d 115, 128 (Mass. 2012) (finding no presumed prejudice, in part because the jury was drawn from the most populous county in New England).

With respect to the pervasiveness of the media coverage, the defendant cites "information about the circulation of the three leading sources of news about the crimes: the Union Leader, WMUR, and the Nashua Telegraph." Unlike in *Rideau*, however, where the defendant provided evidence that an estimated 106,000 people in a population of 150,000 had been exposed to his confession, *Rideau*, 373 U.S. at 724, the defendant here concedes that "no definitive number of potential jurors exposed to . . . media [about the crime] can be created." Although the defendant maintains that "[d]uring the Spader trial, WMUR estimated that an average of almost" 41,000 adults in Hillsborough County watched the evening news, these numbers represent only approximately ten percent of Hillsborough County's population. Moreover, although "the record reflects how many homes in Hillsborough County received the Union Leader," as the defendant acknowledges, "it cannot be calculated how many jury-eligible adults within the home read [reports] on the Mont Vernon crimes." Similarly, as recognized by the defendant, "website viewers may be anywhere in the county, state, or country." Given these circumstances, we cannot conclude that the publicity so saturated the community as to require a presumption of prejudice. *See*

*Coleman v. Kemp*, 778 F.2d 1487, 1491-1540 (11th Cir. 1985) (concluding that prejudice could be presumed where pretrial publicity consisting of over 150 newspaper articles and various news broadcasts saturated a community of approximately 7,000).

### 2. Nature of the Reporting

 The defendant also claims that the nature of the reporting was prejudicial because "[r]eports of the Spader trial graphically described the crimes and the victims' injuries, often using inflammatory language." "[I]nherent, or presumptive, prejudice will only be found in cases where the publicity is of a certain nature," *Smart*, 136 N.H. at 647, and "attends only the extreme case," *Skilling*, 130 S. Ct. at 2915. "[I]t is the adverse nature of the publicity, not merely its quantity, that is critical in finding presumptive prejudice." *Smart*, 136 N.H. at 649. However, even pervasive, adverse pretrial publicity "does not inevitably lead to an unfair trial." *Skilling*, 130 S. Ct. at 2916 (quotation omitted).

The defendant describes as inflammatory certain words in some of the news reports, including "vicious," "savage," "gruesome," "horrific," "torture," and "depravity." We have reviewed the material submitted by the defendant, and, although some of the news reports were accusatory in content and included graphic descriptions of the crimes, we agree with the trial court that an overwhelming amount of the material submitted consists of straightforward, factual accounts of the crimes as recounted at Spader's trial and the proceedings leading up to the defendant's trial. *See Skilling*, 130 S. Ct. at 2916-17 n.17 (noting that "[w]hen publicity is about the event, rather than directed at individual defendants, this may lessen any prejudicial impact" (quotation omitted)); *Smart*, 136 N.H. at 649 (finding no presumed prejudice despite some hostile and accusatory pretrial publicity). "Distinguishing between straightforward factual publicity about a celebrated case and inflammatory, adverse press is crucial." *Smart*, 136 N.H. at 649. "To ignore these real differences in the potential for prejudice would not advance the cause of fundamental fairness, but only make impossible the timely prosecution of persons who are well known in the community, whether they be notorious or merely prominent." *Id.* (quotation omitted). Here, the media coverage cited by the defendant "was not directed at arousing or inciting the passion of the community." *Mitchell*, 752 F. Supp. 2d at 1222 (quotation omitted).

The defendant also points to reports of the Spader trial describing his involvement in the crimes as evidence of presumed prejudice. Here, however, unlike in *Rideau*, in which the defendant disputed his guilt and

the media repeatedly broadcast his "dramatically staged admission," *Skilling*, 130 S. Ct. at 2913, 2916, the defendant admitted to killing Cates and attempting to kill her daughter.

The defendant further suggests that presumptive prejudice resulted from reports on the Spader trial containing "information about [the defendant] that was not introduced at his trial, such as Spader's statements about [the defendant's] involvement" and that the defendant "received 'fan mail.' " The defendant does not claim that the reports contained evidence that was inadmissible but simply that they contained evidence *not admitted* at his trial. Although there may be instances in which news reports containing *inadmissible* evidence are sufficient to presume jury prejudice, the mere fact that certain reports contained information that was *not admitted* in the defendant's trial is not sufficient to presume jury prejudice. *See Patton v. Yount*, 467 U.S. 1025, 1029, 1040 (1984) (pretrial publicity did not render a fair trial unlikely even when publicity revealed, among other things, "information not admitted into evidence at trial"); *Smart*, 136 N.H. at 650. Moreover, as stated above, the defendant in this case admitted his involvement in the charged crimes. Thus, we conclude that news reports containing Spader's statements about the defendant's involvement in the crimes were insufficient to create a presumption of prejudice.

### 3. Timing of the Trial in Relation to the Crime

██ "[C]ourts generally find no presumption of inherent unfairness where there has been a substantial delay between the criminal act and the trial." *Mitchell*, 752 F. Supp. 2d at 1224 (quotation omitted). For instance, in *Skilling*, the Supreme Court found significant that four years had elapsed between the time of Enron's collapse and the defendant's trial, stating that "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Skilling* 130 S. Ct. at 2916. Here, the crimes occurred in October 2009 and the defendant's trial occurred nearly a year and a half later in March 2011. The defendant acknowledges that the media coverage of the crimes "abated in the fall of 2009." Thus, the passage of time between the crimes and the defendant's trial diminished any presumptive impact of the publicity at the time the crime was committed. *See Goss v. Nelson*, 439 F.3d 621, 633 (10th Cir. 2006) ("The passage of time before trial — in this case over a year — also diminishes the presumptive impact of publicity occurring at the time the crime was committed.").

### 4. Media Coverage of Spader's Trial

The defendant further argues that a change of venue was required because his trial occurred shortly after Spader's trial, during which extensive media coverage revived interest in the crimes. Thus, we turn to

the question of whether the timing of the media coverage of Spader's trial warranted "an automatic presumption of prejudice." *Skilling*, 130 S. Ct. at 2917.

The defendant's trial took place approximately four months after the verdict in the Spader trial. Spader's trial received substantial publicity. The bulk of the media accounts submitted by the defendant were generated during and immediately following Spader's trial. The defendant submitted thirty-three articles related to Spader's trial, twenty-four of which mention the defendant, as well as seven additional articles related to the defendant's trial. As noted above, almost all of the material submitted consists of straightforward, factual accounts of the crimes as recounted at Spader's trial and the proceedings leading up to the defendant's trial.

More importantly, however, given that the defendant admitted his participation in the crimes and pleaded not guilty by reason of insanity, Spader's trial "ha[d] little relevance to [the defendant's] state of mind at the time of the alleged crime." *Mitchell*, 752 F. Supp. 2d at 1227 (finding co-defendant's guilty plea not relevant to defendant's case because he pleaded insanity). As the trial court correctly observed, the issues raised in Spader's trial were "remarkably different" from those raised in the defendant's trial. Spader pleaded not guilty, and, thus, at trial, the State bore the burden of proving his guilt beyond a reasonable doubt. Here, on the other hand, the defendant admitted that he committed the acts charged but claimed that he was not guilty because he was insane at the time he committed them. Therefore, at his trial, the defendant had the burden of proving his insanity defense. *See* RSA 628:2 (2007). Consequently, to the extent that media reporting on the Spader trial described the defendant's involvement in the crime, the defendant admitted as much when he pleaded not guilty by reason of insanity. Although the publicity about Spader's trial "calls for inquiry to guard against actual prejudice, it does not ordinarily — and, we are satisfied, it did not here — warrant an automatic presumption of prejudice." *Skilling*, 130 S. Ct. at 2917 (finding that co-defendant's guilty plea a little over a month before jury selection began in defendant's trial did not warrant a presumption of prejudice so as to require a change of venue).

### B. Voir Dire

The defendant next asserts that the trial court erred in failing to grant a change of venue because the "[s]tatements of potential jurors in both the Spader and [the defendant's] case[ ] confirm that the venue was overwhelmingly exposed to media coverage and hostile public opinion."

 "The manner in which *voir dire* is conducted is wholly within the sound discretion of the trial court," *State v. Addison*, 161 N.H. 300, 303 (2010) (quotation and brackets omitted), and "[n]o hard-and-fast formula

dictates the necessary depth or breadth of *voir dire*," *Skilling*, 130 S. Ct. at 2917. Whether a prospective juror is free from prejudice is a determination to be made in the first instance by the trial court on *voir dire*. *Addison*, 161 N.H. at 303; *see also Skilling*, 130 S. Ct. at 2917 ("Jury selection . . . is particularly within the province of the trial judge." (quotation omitted)); *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) (noting that the trial judge is granted "wide discretion . . . in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias"). Accordingly, as recognized by the Supreme Court:

> Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record — among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty. In contrast to the cold transcript received by the appellate court, the in-the-moment *voir dire* affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service.

*Skilling*, 130 S. Ct. at 2918 (citation omitted).

██ ██ We will not presume unfairness of a constitutional magnitude simply because the community was aware of the crimes and the charges against the defendant. *See Dobbert v. Florida*, 432 U.S. 282, 303 (1977). "It is not required . . . that the jurors be totally ignorant of the facts and issues involved." *Irvin*, 366 U.S. at 722.

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the .presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id.* at 722-23; *see also Laaman*, 114 N.H. at 800. Indeed, "in today's 'information age,' where news of community events are disseminated virtually instantaneously by an ever multiplying array of delivery methods, it would be difficult to find 12 jurors who do not at least have some

knowledge of the facts of an important and tragic incident like this one." *Com. v. Briggs*, 12 A.3d 291, 313 (Pa. 2011). Thus, the crucial question "is not whether the community remembered the case, but whether the jurors at [the defendant's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton*, 467 U.S. at 1035; *see also Briggs*, 12 A.3d at 314 ("the pivotal question in determining whether an impartial jury may be selected is . . . whether it is possible for [the] jurors to set aside their impressions or preliminary opinions and render a verdict solely based on the evidence presented to them at trial").

█ We have reviewed the 2,347-page transcript of jury selection and have found no evidence to support the defendant's argument that a change of venue was required. Rather, the record establishes that the trial court conducted a thorough jury selection process over a period of eight days and went to great lengths to ensure that the empanelled jury was fair and impartial. *See State v. Nelson*, 103 N.H. 478, 484 (1961) (requiring three weeks to pick jury in widely publicized case not evidence of prejudice but rather shows court's "extreme care" in obtaining an impartial jury); *see also Patton*, 467 U.S. at 1027 (jury selection took ten days and generated 1,186 pages of testimony). For example, on the first day of jury selection, the court provided the prospective jurors with a letter, which explained to them that they had been summoned for the defendant's case and provided a detailed explanation of the procedures to be used in jury selection. The letter further informed the prospective jurors that, until their service was completed, they were not allowed "to read any newspaper articles, listen to any radio or television reports, or review any materials on the internet that may concern this case."

After the jury selection began, the court again instructed the prospective jurors that, until they were excused from the panel, they were "not to read, watch, or listen to anything about this case." In its preliminary instructions, the court stressed the importance of deciding the case based solely upon the evidence presented and the obligation to be fair and impartial. The court also explained the nature of the charges and the insanity defense. The court then read to the venire a series of questions as to which affirmative answers could potentially warrant disqualification. Thereafter, the court met individually with those prospective jurors who answered affirmatively and determined whether disqualification was in fact warranted.

█ After two days of preliminary jury selection, the court and the attorneys conducted individual *voir dire* of 107 prospective jurors. Although the defendant argues that the supplemental questionnaire that he submitted to the court "would have ensured that each potential juror was questioned about the extent and effect of pretrial publicity and community

sentiment," the record demonstrates that, in fact, the court and the parties questioned the prospective jurors regarding the extent and effect of their exposure to pretrial publicity and community sentiment. *See Mu'Min*, 500 U.S. at 431-32 (holding that United States Constitution does not require inquiry about pretrial prejudice to include specific questions regarding content of what each juror has read). The court began its questioning by telling the prospective jurors that there were no right or wrong answers to the questions. *See Skilling*, 130 S. Ct. at 2919 (to ensure candor the court admonished each juror "that there were no right and wrong answers to the questions" (quotation and brackets omitted)). The court then asked each prospective juror a series of questions designed to elicit: the juror's prior knowledge of the case through publicity or otherwise; the extent of the juror's exposure to the media coverage of the case; whether the juror held or had expressed an opinion on the case, the defendant, or anyone else involved in the case; whether the juror would be able to set aside any information or opinions the juror had heard outside of the courtroom and render a fair and impartial verdict based solely upon the evidence presented; and whether, if the juror remembered something the juror may have read or heard during trial, the juror would be able to set it aside and not share it with other jurors. The attorneys for each side were then allowed up to ten minutes to question each prospective juror.

Our review of the individual *voir dire* demonstrates that almost all of the prospective jurors were aware of the crimes before jury selection, and nearly seventy-one percent were aware of the crimes because of exposure to pretrial media coverage. Sixty-five were excused for cause, and less than one third of that group was excused because of bias or preconceptions regarding the issue of the defendant's sanity. The remainder of those excused for cause were excused for other reasons such as inability to follow the court's instructions to refrain from media exposure and discussing the case, inability to understand the burden of proof, or because they had personal connections to the crimes or those involved in the case.

All sixteen seated jurors reported knowing about the crimes prior to jury selection, and most acknowledged that they had seen or heard media accounts of the case. Some reported learning about the case only at the time the crimes occurred, while others reported learning about it through media accounts of Spader's trial, and slightly more than half of those seated had discussed the crimes prior to jury selection or heard others talking about the case. The court denied the defendant's motions to excuse seven of the seated jurors for cause, but only five of those motions were based upon prior knowledge about the case or exposure to pretrial media or the opinions of others. In each instance, the court concluded that the juror's

responses demonstrated that he or she would be able to render a decision based only upon the evidence presented.

■■■ This was not a "trial atmosphere utterly corrupted by press coverage." *Dobbert*, 432 U.S. at 303 (quotation and ellipsis omitted). "There is no suggestion of a circus atmosphere or lynch mob mentality . . . or of any other community-wide rush to judgment that infected other trials that have been set aside for lack of an impartial jury." *Stafford v. Saffle*, 34 F.3d 1557, 1566 (10th Cir. 1994). "Simply showing that [most of] the potential jurors knew about the case and that there was extensive pretrial publicity will not suffice to demonstrate that an irrepressibly hostile attitude pervaded the community." *Id.* at 1567. Indeed, given the nature of the crimes in this case, the defendant could not reasonably have expected to remain anonymous. *See Dobbert*, 432 U.S. at 303; *Nelson*, 103 N.H. at 484.

Nor is it enough to show that some of the prospective jurors discussed the crimes or heard discussions of the case prior to being called for jury selection. This is particularly so since all of the jurors eventually seated stated that they would decide the case based only upon the evidence and not let media accounts or previous discussions affect their ability to decide the case. *Cf. Moore v. State*, 481 S.E.2d 892, 895 (Ga. Ct. App. 1997) (noting that "[s]ome prospective jurors apparently discussed the crime while waiting in the hallway prior to jury selection," but "each member of the venire who overheard that discussion denied hearing any opinion regarding the guilt of the defendants and stated the discussion would not affect his or her ability to decide the case based only on the evidence presented").

Moreover, the record in this case does not reveal a "pattern of deep and bitter prejudice . . . throughout the community" that would require a change in venue. *Irvin*, 366 U.S. at 727 (quotation omitted). Unlike in *Irvin*, where the court excused over half of the prospective jurors "on challenges for cause as having fixed opinions as to the guilt" of the defendant and "almost 90% of those examined on the point . . . entertained some opinion as to guilt — ranging in intensity from mere suspicion to absolute certainty," *id.*, here, less than twenty percent of those individually questioned were excused based upon bias or preconceptions regarding the defendant's sanity. Likewise, whereas in *Irvin*, "[e]ight out of the 12 [seated jurors] thought [the defendant] was guilty," *id.*, in this case, *voir dire* established that none of the seated jurors had in fact formed an opinion as to the defendant's sanity.

Rather, this case is more akin to *Murphy v. Florida*, 421 U.S. 794, 803 (1975), in which the Supreme Court found that the jury selection process did not permit an inference of actual prejudice where "20 of the 78 persons questioned were excused because they indicated an opinion as to [the

defendant's] guilt." The Court stated that while "[t]his may indeed be more than would occur in the trial of a totally obscure person, . . . it by no means suggests a community with sentiment so poisoned against [the defendant] as to impeach the indifference of jurors who displayed no animus of their own." *Id.*; *see also Briggs*, 12 A.3d at 316-18 (finding no error in denying defendant's motions to change venue when twelve percent of the prospective jurors "stated that they had a fixed, unalterable opinion of [defendant's] guilt"). Taking all of the circumstances into account, we conclude that there is ample support for the trial court's conclusion that the defendant was unable to demonstrate any actual bias or prejudice in the seated jury panel.

Thus, we hold that the defendant has failed to establish that a presumption of prejudice arose from the pretrial publicity or that the publicity infected the jurors to such an extent that he was unable to receive a fair and impartial jury trial. Accordingly, we conclude that the trial court did not err in denying the defendant's motions to change venue.

As the Federal Constitution offers the defendant no greater protection than the State Constitution under these circumstances, *see Skilling*, 130 S. Ct. at 2912-15; *Smart*, 136 N.H. at 646, we reach the same result under the Federal Constitution as we do under the State Constitution.

### III. Jury Instructions

Before trial, both the defendant and the State submitted proposed jury instructions on the issue of insanity. The State's proposed instructions enumerated specific factors that the jury could consider in determining whether the defendant was insane at the time he committed the crimes. These instructions were drawn from the 2005 drafting committee's version of recommended New Hampshire Criminal Jury Instructions on insanity. The defendant objected to the State's proposed instructions but requested that, if the court were to use them, it also include certain other enumerated factors for the jury to consider in determining whether the defendant was insane. The trial court denied the defendant's proposed insanity instructions and ruled that it would "instruct the jury on the insanity defense consistent with the 2005 draft model jury instructions."

At trial, the defendant renewed his request that the insanity instruction not specify factors for the jury's consideration. He claimed that "the facts of the case have made clear" that the "instruction unfairly comments on the evidence and suggests that the State's theory of their case as to the definition of 'mental disease' is favored by the Court, when it is not supported by the law." The State objected, and the court denied the defendant's request.

On appeal, the defendant argues that the trial court erred in instructing the jury that it could consider certain specified factors in its determination of insanity. The defendant contends that the specified factors overwhelmingly favored the State's theory of the case. The State disagrees, arguing that "[t]he challenged instructions neither advocated [for] nor repudiated the State's trial position" but "merely set forth possibly helpful factors that jurors could consider in weighing the merits of those positions."

█ █ The purpose of a trial court's jury instructions is to state and explain to the jury, in clear and intelligible language, the rules of law applicable to the case. *State v. Cegelis*, 138 N.H. 249, 252 (1994). When reviewing jury instructions, we determine whether the instructions adequately and accurately explain each element of the offense and reverse only if the instructions did not fairly cover the issues of law arising in the case. *See State v. Hernandez*, 159 N.H. 394, 400 (2009).

> The scope and wording of jury instructions is generally within the sound discretion of the trial court, and any allegations of error will be evaluated by interpreting the disputed instructions in their entirety, as a reasonable juror would have understood them, and in light of all the evidence in the case.

*Cegelis*, 138 N.H. at 251-52 (quotation omitted). We review the trial court's decisions on these matters for an unsustainable exercise of discretion. *Hernandez*, 159 N.H. at 400. "To show that the trial court's decision is not sustainable, the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case." *State v. Davidson*, 163 N.H. 462, 472 (2012) (quotation omitted).

In this case, the disputed insanity instruction provided, in pertinent part:

> In deciding whether the defendant was insane, you may consider any evidence of insanity. You may consider, for example, the nature of the defendant's acts, whether he was suffering from delusions or hallucinations, whether he knew the difference between right and wrong, and whether he knew the nature of his acts. You may also consider whether the defendant acted impulsively or acted with cunning and planning in executing his crimes and escaping or avoiding detection. You may also consider whether he had the power to choose between right and wrong and whether he could recognize acquaintances and transact business or manage his affairs.
>
> Now, none of these things, however, is a test for insanity. You may consider all of these things, some of them, or none of them,

or whatever else you think is pertinent to the issue of whether the defendant was sane or insane at the time he committed his various illegal acts.

The defendant does not challenge the substance of the instruction itself. Indeed, he acknowledges that "[t]he specific factors the trial court used here are similar to those listed in the standard jury instructions on insanity and mentioned in" our previous decisions on the insanity defense. Nevertheless, he argues that "[b]y specifying factors, the trial court gave an instruction that supported the State's theory of the case and influenced how the jury considered the evidence." We disagree.

"A trial judge's primary duty in charging the jury is to clarify the issues of the case, and to assist the jury in understanding the questions to be resolved." *State v. King*, 136 N.H. 674, 677 (1993) (quotation omitted). In New Hampshire, "it is the practice of Superior Court judges not to comment upon the evidence or upon the credibility of witnesses in the charge to the jury." *Id.* (quotation and brackets omitted). Such practice is prudent given that "the influence of the trial judge on the jury is necessarily and properly of great weight and his slightest word or intimation is received with deference, and may prove controlling." *Id.* (quotation and brackets omitted).

Upon review of the instructions in their entirety, and although we do not adopt these instructions as the *only* way to instruct the jury on the insanity defense, we find no error. The trial court instructed the jury that "[i]t is up [to] you . . . to determine as a question of fact whether the defendant suffered from a mental disease or defect that caused him to act as charged." *See State v. Fichera*, 153 N.H. 588, 593 (2006) (explaining that sanity and whether a mental disease or defect caused the charged conduct are questions of fact to be determined by jury). It explained that the jury may consider "any evidence of insanity" and provided the challenged factors as examples of what the jurors *could* consider as evidence of insanity. However, it made clear that the jury did not have to consider the factors and, in fact, that none of the factors is a test for insanity. *See State v. Plante*, 134 N.H. 456, 461 (1991) ("[A]ny test which measures the capacity of the defendant is a matter of evidence, which falls within the province of the jury to be considered like any other factual issue.").

The defendant suggests that the court's instruction erroneously stressed two factors, *i.e.*, "the nature of the charged acts and whether [the defendant] knew and could choose between right and wrong." We disagree. We do not read the instructions as emphasizing any one factor. Moreover, the court instructed the jury that it could consider whatever else it found

relevant to the issue of insanity. Thus, the instructions left the jurors free to consider any factor they deemed relevant to the issue of insanity, whether or not the factor was mentioned in the instruction. *See id.* at 462. In accordance with the applicable law on the insanity defense, the trial court also correctly stated that there is no legal definition or test for insanity. *See Fichera,* 153 N.H. at 593 (explaining that "there is no test for determining whether a defendant is insane" (quotation omitted)); *Plante,* 134 N.H. at 461 ("There is no specific test or criterion which determines the issue of mental illness.").

Citing statements made by the prosecutor in the State's closing argument, the defendant asserts that the State's theory of the case was that he "was not insane because he exhibited none of the factors contained in the court's instructions," and that, since the court provided examples of factors that supported only the State's theory, "the court shaped the course of the jury's deliberation of the evidence." Simply because the State tailored its closing argument to the enumerated factors that the court instructed the jury that it *could* consider, does not mean that the instruction improperly supported the State's theory of the case. *Cf. United States v. Prawl,* 168 F.3d 622, 629 (2d Cir. 1999) (stating that the purpose of the jury instruction notice requirement in the Federal Rules of Criminal Procedure "is to allow counsel to conform their arguments to the law as it will thereafter be presented by the judge to the jury" (quotation omitted)); 88 C.J.S. *Trial* § 298, at 297-98 (2012) ("Counsel may base his or her argument on the instructions of the court.").

This is not a case where the court improperly focused the jury's attention on specific portions of the State's evidence and away from the defendant's theory of the case. *See King,* 136 N.H. at 678 (finding improper the trial court's references in its jury instructions to specific evidence presented at trial by State and its failure to mention exculpatory testimony of defendant). Nor is this a case in which the trial court's instructions invaded the exclusive province of the jury in deciding which facts are proved by the evidence. *See State v. Ross,* 141 N.H. 397, 399-400 (1996) (finding that trial court's instruction invaded the fact-finding function of the jury and eclipsed the permissible preceding statement of law). Further, the court explicitly instructed the jury that the arguments made by counsel "are not evidence" and that the jury "may not consider [the arguments] as evidence."

In view of the entire charge, we find that a reasonable juror would not have understood the instruction as supporting the State's theory of the case; rather, it empowered the jury to consider *any evidence* that it deemed

relevant to the issue of the defendant's insanity. Accordingly, we hold that the trial court did not err in instructing the jury as it did.

*Affirmed.*

DALIANIS, C.J., and HICKS and CONBOY, JJ., concurred.