Coos
No. 2013-828

THE STATE OF NEW HAMPSHIRE

v.

MAKENZY THELUSMA

Argued: January 7, 2015
Opinion Issued: March 20, 2015

*Joseph A. Foster*, attorney general (*Stephen D. Fuller*, senior assistant attorney general, on the brief and orally), for the State.

*Christopher M. Johnson*, chief appellate defender, of Concord, on the brief and orally, for the defendant.

LYNN, J. Following a jury trial in Superior Court (*Bornstein*, J.), the defendant, Makenzy Thelusma, was convicted of possession of heroin, cocaine, and marijuana. *See* RSA 318-B:2, I (Supp. 2014). The defendant appeals, arguing that: (1) an inculpatory statement he made to the police should have been suppressed; and (2) the evidence was insufficient to support his heroin and cocaine convictions. We affirm.

I

The following facts are derived from the record. On August 9, 2012, Sergeant Roy, a Berlin police officer, observed the defendant driving the wrong way on a one-way street. Roy stopped the car and the defendant produced a New York state identification card, but not a driver's license. While Roy was in his cruiser unsuccessfully seeking to determine whether the defendant had a valid driver's license, Officer White arrived to assist. White obtained the defendant's consent to search the vehicle. At that point, two individuals, Nika Wedge and "Chance," approached the scene on foot. The individuals spoke to the defendant and approached his car. Roy told them to "back off." The defendant got out of his car and walked over to the two, saying that he was going to give Wedge his wallet. Roy saw that the defendant had more than a wallet in his hand, but could not say what else the defendant had. Roy told the defendant to stop, but the defendant and

Wedge "made an exchange." Roy then observed that Wedge had a wallet and a "wad" of cash in her hand and that she appeared to be tucking something into her bra. Roy then took custody of Wedge, and pinned her against the defendant's car near the open driver's side window. At this time, White took custody of the defendant. While Roy and White were making these arrests, Chance approached and began yelling and threatening them. Roy used one hand to point his taser at Chance, holding Wedge by her left arm, leaving her right arm free. White performed a quick search of the defendant and put him in his cruiser, and then unsuccessfully attempted to apprehend Chance.

Officer Santos from the Gorham Police Department then arrived to assist Roy and White. Before transporting the defendant to the Berlin police station, Santos searched him and found marijuana. Before transporting Wedge to the station, Roy searched the area where he had held her against the car to see if she had dropped anything. He found nothing. At the station, a female dispatcher watched Wedge undress and also found nothing. After the defendant and Wedge were brought to the station, White performed an inventory search of the car. On the passenger's seat he discovered a small cloth bag that contained heroin and crack cocaine. The bag had not been there earlier when White had commenced his search of the car before the arrival of Chance and Wedge. Roy could not say whether the bag was one of the items that the defendant handed to Wedge.

At the police station, Roy asked the defendant to review a *Miranda* rights form. *See Miranda v. Arizona*, 384 U.S. 436 (1966). The defendant read the form and initialed it, indicating that he understood his rights, but did not sign the waiver portion of the form. Hours later, Detective Goulet came to the defendant's holding cell to serve written notice that the police intended to seek forfeiture of the money found on him. Goulet explained that the defendant could forfeit the money voluntarily or contest the forfeiture. Goulet advised that the State seeks forfeiture when money is involved with drugs and that the defendant "had a good chunk of drugs" on him when he was arrested. The defendant said that he had no drugs on him other than marijuana, to which Goulet replied that they had other statements in reference to the drugs. Goulet continued explaining voluntary forfeiture and showed the defendant a form on which he could indicate whether he intended to contest it. Goulet asked the defendant if he understood the form and the defendant asked Goulet if the police were going to take his money. Goulet replied that the police were going to seek forfeiture whether the defendant contested it or not. The defendant then asked Goulet what the police were going to do with him. Goulet responded that the defendant would have a bail hearing. The defendant asked what would happen at the bail hearing, and Goulet explained the process and

possible outcomes, including personal recognizance bail. The defendant told Goulet that he had been stopped only because he was not familiar with Berlin and went the wrong way on the street. He further said that the police thought he had given Wedge drugs, but he had only given her a "duffle bag" that he found behind a local restaurant. The defendant stated that he had put the bag in his pocket, and later gave it to Wedge.

The defendant was charged with two felony counts of possession of a controlled drug — heroin and crack cocaine — and one misdemeanor count of possession of marijuana. The defendant moved to suppress statements he made to Roy and Goulet, claiming that they were obtained in violation of *Miranda*. The trial court granted the motion in part, but allowed the State to admit the defendant's statement to Goulet that he found the bag behind the restaurant and later gave it to Wedge. The trial court ruled that, although the defendant had not waived his *Miranda* rights, the statement was volunteered and not the product of interrogation. After the State presented its evidence at trial, the defendant moved to dismiss the heroin and cocaine indictments on the grounds that the State had presented insufficient evidence to convict. The court denied the motion, and the jury convicted the defendant. This appeal followed.

## II

The defendant first argues that his statement regarding the bag was the product of interrogation and, therefore, obtained in violation of *Miranda*. *See Miranda*, 384 U.S. 436. Whether a defendant is subject to interrogation is a mixed question of law and fact. *State v. Spencer*, 149 N.H. 622, 625 (2003). Thus, we defer to the trial court's factual findings unless they are contrary to the manifest weight of the evidence, but we review the ultimate determination of interrogation *de novo*. *Id*. As the defendant bases his claim upon both the State and Federal Constitutions, we first address it under the State Constitution and rely upon federal law only to aid in our analysis. *See State v. Ball*, 124 N.H. 226, 231-33 (1983).

▬▬▬ Part I, Article 15 of the New Hampshire Constitution and the Fifth and Fourteenth Amendments to the United States Constitution afford individuals a privilege against self-incrimination. N.H. CONST. pt. I, art. 15; U.S. CONST. amends. V, XIV. To protect this privilege, statements obtained through custodial interrogation cannot be used unless the procedural safeguards outlined in *Miranda* are followed. *See State v. McKenna*, 166 N.H. 671, 676 (2014). Here, there is no dispute that the defendant was in custody when he made the statement at issue. The question is whether the statement was the product of interrogation. "Interrogation for *Miranda* purposes occurs when a person in custody is subjected to either express questioning or its functional equivalent." *State v. Gribble*, 165 N.H. 1, 11

(2013). The "functional equivalent" of interrogation means "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Although the "functional equivalent" inquiry "focuses primarily upon the perceptions of the suspect, rather than the intent of the police," officers "cannot be held accountable for the unforeseeable results of their words or actions." *Id.* at 301-02. Therefore "the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* The State has the burden to prove, beyond a reasonable doubt, that it did not violate a defendant's rights under *Miranda. Gribble*, 165 N.H. at 10.

■ Under certain circumstances, statements obtained by police from a subject in custody do not violate *Miranda*. "Volunteered statements of any kind" are not affected by *Miranda. Miranda*, 384 U.S. at 478. In addition, courts have recognized that certain types of police conduct do not constitute interrogation for purposes of *Miranda*. For example, there is no need for police to provide warnings before asking a person under arrest routine booking or administrative questions. *Pennsylvania v. Muniz*, 496 U.S. 582, 601-02 (1990); *South Dakota v. Neville*, 459 U.S. 553, 564 n.15 (1983). Police can inform individuals about charges against them or about evidence. *State v. Guajardo*, 135 N.H. 401, 403-04 (1992); *United States v. Collins*, 683 F.3d 697, 703 (6th Cir. 2012). Police also may respond to direct questions asked by defendants. *Gribble*, 165 N.H. at 12; *Spencer*, 149 N.H. at 625; *United States v. Briggs*, 273 F.3d 737, 740-41 (7th Cir. 2001) (collecting cases); *United States v. Conley*, 156 F.3d 78, 83 (1st Cir. 1998).

The defendant argues that, because Goulet initiated the civil forfeiture conversation, the defendant's statement about the bag was the product of interrogation. The defendant argues that, although he asked Goulet a question, he did so in the context of the forfeiture conversation. He contends that, because there are logical links between forfeiture of the money found in his possession, bail, and his statement about finding the bag, Goulet should have known that the conversation was reasonably likely to lead to inculpatory statements. The State responds that the defendant changed the topic of the conversation on his own initiative, and, therefore, his statement regarding the bag was volunteered.

The defendant is correct that Goulet initiated the conversation about forfeiture, during which Goulet stated that the money was connected to drugs. However, before the defendant answered whether he would voluntarily forfeit the money, the defendant asked what the police were going to

do with him. Goulet responded that he would have a bail hearing. Goulet then answered the defendant's follow-up question by explaining more about the bail process and types of bail. It was then that the defendant made the inculpatory statement about finding the bag and later giving it to Wedge.

We cannot find that Goulet should have known that notifying the defendant about forfeiture of money, or answering his question about bail, was reasonably likely to lead to the defendant making inculpatory statements about his discovery of the bag or what he did with it. The defendant may be correct that, viewed after the fact, the conversation flows logically, but our task is not to "connect the dots" with the benefit of 20/20 hindsight. Rather, we consider the "words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 302. That words or actions actually did elicit an incriminating response from a defendant is not the controlling factor in our analysis because "the nature of [a police officer's] statements and their effect are separate issues." *State v. Plch*, 149 N.H. 608, 614 (2003).

The trial court did not find, and the defendant does not argue, that Goulet's actions of notifying the defendant about the State's intent to seek forfeiture, explaining the options, and asking whether the defendant would voluntarily agree to forfeiture did not serve a legitimate administrative purpose, or that the officer's conduct was a pretext designed to secure incriminating admissions. *See Muniz*, 496 U.S at 602, n.14, 604-05 (finding no interrogation when officer provided defendant with relevant information about breathalyzer test and Implied Consent Law and asked defendant only whether he understood instructions and wished to submit to test, notwithstanding that defendant responded by commenting on his state of inebriation). That Goulet mentioned the connection between the drugs and the money and indicated that there was other evidence tying the defendant to the drugs did not turn his explanations of administrative and other routine matters into the functional equivalent of interrogation. *See Spencer*, 149 N.H. at 625-26 (showing defendant bank surveillance photographs in response to defendant's claims of innocence and repeated questions about the basis for her arrest was not the functional equivalent of interrogation). Similarly, Goulet's responses to the defendant's direct questions about what the police were going to do with him and about the bail process did not constitute interrogation or its functional equivalent. *See Gribble*, 165 N.H. at 12 (holding it was not the functional equivalent of interrogation when police officer answered defendant's questions about his job, the death penalty, or murder charges in general); *Briggs*, 273 F.3d at 740-41 (holding police did not engage in functional equivalent of interrogation when police officer responded to suspect's question about what would happen to him).

■ The defendant himself initiated the general discussion about what lay ahead for him and the bail process. *Cf. Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983). Goulet limited his responses to a factual description of the bail process, and his explanations did not call for any reply from the defendant. The defendant volunteered the statement about the bag, and we cannot say that Goulet should have known that answering the defendant's questions was reasonably likely to elicit it or any other inculpatory statement. *See Spencer*, 149 N.H. at 626. As his argument suggests, the defendant might have been thinking about his chances for release on personal recognizance bail, which spurred him to make the statement, but his "anxiety to be released on bail does not amount to coercion to incriminate himself." *Fenner v. State*, 846 A.2d 1020, 1029 (Md. 2004) (quotation omitted). In sum, we conclude that the trial court did not err in allowing the State to admit the statement.

The Federal Constitution offers the defendant no greater protection than does the State Constitution under these circumstances. *See Gribble*, 165 N.H. at 14; *Spencer*, 149 N.H. at 629; *Innis*, 446 U.S. at 300-02. Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

## III

The defendant next argues that the evidence was insufficient to convict him of possession of heroin and cocaine. When considering a challenge to the sufficiency of the evidence, "we objectively review the record to' determine whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, considering all the evidence and all reasonable inferences therefrom in the light most favorable to the State." *State v. Germain*, 165 N.H. 350, 354-55 (2013) (quotation omitted). "It is the defendant who bears the burden of demonstrating that the evidence was insufficient to prove guilt." *Id.* at 355 (quotation omitted). "In reviewing the evidence, we examine each evidentiary item in the context of all the evidence, not in isolation." *Id.* (quotation omitted). "Further, the trier may draw reasonable inferences from facts proved and also inferences from facts found as a result of other inferences, provided they can be reasonably drawn therefrom." *Id.* (quotation omitted).

■ To convict a defendant of possession of a controlled drug, the State must prove beyond a reasonable doubt that the defendant: "(1) had knowledge of the nature of the drug; (2) had knowledge of its presence in his vicinity; and (3) had custody of the drug and exercised dominion and control over it." *State v. Trebian*, 164 N.H. 629, 632 (2013). If the drug was

not found in the defendant's physical possession, the State must prove constructive possession, which "can be inferred from circumstances linking the defendant to the drugs." *Id.*

Here, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found guilt beyond a reasonable doubt. The State's theory at trial was that the defendant had the bag with drugs in his possession when he was stopped by police. When he was about to be arrested, he passed the bag to Wedge. While Wedge was being arrested, she dropped the bag into the defendant's car, where the police found it. The State presented evidence that the defendant told Goulet that he found the bag, put it in his pocket, and later gave it to Wedge. The defendant argues that this statement should be disregarded because there is ambiguity as to which bag the defendant's statement refers, inasmuch as the defendant called it a duffle bag, while the police described it as a "Crown Royal bag," jewelry bag, or purse. However, we examine the defendant's statement in the context of all the other evidence and not in isolation. *See Germain,* 165 N.H at 355. There was no evidence of another bag of any kind found at the scene, in the car, on Wedge, or on the defendant, and there was no evidence that a bag could have been passed to Chance, the other person in the area. A rational trier of fact could have found that the defendant's statement referred to the bag containing the drugs.

■ Along with the defendant's statement, the State offered other evidence to support its theory. The police saw the defendant pass something to Wedge and saw Wedge tuck something into her bra immediately after the exchange. As Wedge was arrested, Roy was distracted by Chance, and Wedge had a free hand near the open car window. The bag was found in the car after this point, but had not been there when the police first looked in the car. Taking this evidence and inferences drawn therefrom, the jury could have concluded that the defendant had custody and exercised dominion and control over the drugs. The jury likewise could have found that the defendant knew that the drugs were present in his vicinity. The jury could have inferred from the evidence that, while being arrested, the defendant gave the bag to Wedge and that he then attempted to "explain away" the bag when he spoke to Goulet. The jury also could have inferred from the totality of these circumstances that the defendant had knowledge of the nature of the drugs. Considering all the evidence and all reasonable inferences therefrom in the light most favorable to the State, a rational trier of fact could have found all of the elements of drug possession beyond a reasonable doubt. *Germain,* 165 N.H at 354-55.

The defendant argues, nonetheless, that the evidence could also prove an alternative hypothesis — that Wedge brought the bag with drugs to the

scene and dropped it in the defendant's car while she was being arrested. However, this theory does not fit with the defendant's own statement that he found the bag and gave it to Wedge. As noted above, there was no other bag in this case, and the defendant does not explain how his statement to Goulet fits with his alternative theory. Even if the defendant's alternative theory were possible, we do not review whether another hypothesis "could explain the events in an exculpatory fashion," but "whether the alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt." *Germain*, 165 N.H at 361-62. Given the defendant's statement to Goulet, the alternative theory is not reasonable. The defendant has not met his burden to show that no rational trier of fact could have found the State's view of the evidence to be the only reasonable conclusion. Therefore, we conclude that the evidence was sufficient to convict the defendant of possession of heroin and cocaine.

*Affirmed.*

DALIANIS, C.J., and HICKS, CONBOY, and BASSETT, JJ., concurred.