NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

State Board of Education
No. 2015-0032


APPEAL OF FARMINGTON SCHOOL DISTRICT
(New Hampshire State Board of Education)

Argued: November 10, 2015
Opinion Issued: April 7, 2016


James F. Allmendinger, of Concord, NEA-New Hampshire, by brief and orally, for Demetria McKaig.


Soule, Leslie, Kidder, Sayward & Loughman, P.L.L.C., of Salem (Peter C. Phillips on the brief and orally), for Farmington School District.


American Civil Liberties Union of New Hampshire, of Concord (Gilles R. Bissonnette on the brief), and Backus, Meyer & Branch, LLP, of Manchester (Jon Meyer on the brief), for American Civil Liberties Union of New Hampshire, as amicus curiae.


Law Office of Joshua L. Gordon, of Concord (Joshua L. Gordon on the brief), John H. Henn, of Boston, Massachusetts, on the brief, and Foley Hoag

LLP, of Boston, Massachusetts (Sarah S. Burg and Amanda S. Hainsworth on the brief), for Planned Parenthood of Northern New England, as amicus curiae.

Theodore E. Comstock, executive director and general counsel, and Barrett M. Christina, staff attorney, of Concord, New Hampshire School Boards Association, by brief, for New Hampshire School Boards Association, as amicus curiae.

HICKS, J. Farmington School District (district) appeals a decision of the State Board of Education (state board) reversing the decision of the Farmington School Board (local board) not to renew the employment contract of Demetria McKaig, a guidance counselor at Farmington High School. McKaig cross-appeals the state board's decision and argues that she is entitled to reinstatement with back pay and benefits. We affirm in part, reverse in part, order that McKaig be reinstated to her former employment, and remand to the board for further proceedings to determine whether she is entitled to additional remedies.

The state board's decision includes the following facts. McKaig was a high school guidance counselor employed by the district. In November 2012, a student — whom, consistent with the record, we will refer to as "Student A" — and her boyfriend told McKaig and another guidance counselor that Student A was pregnant and that she wanted to terminate her pregnancy. Student A was fifteen years old at the time.

McKaig suggested that Student A tell her mother about the pregnancy, but Student A refused. Student A and her boyfriend told McKaig that they did not want Student A's mother to know about the pregnancy because they were afraid for their safety. McKaig researched Student A's options and found New Hampshire's parental notification and judicial bypass laws for minors seeking an abortion. See RSA 132:33, :34, II (2015).

After meeting with Student A, McKaig and the other guidance counselor met with the principal and other school staff to discuss the issue of Student A's pregnancy. The principal expressed his view that the school should inform Student A's mother about the pregnancy. McKaig disagreed, asserting that Student A had a right to keep the pregnancy confidential. The meeting concluded without a decision about whether to contact Student A's mother.

After the meeting, McKaig spoke with Attorney Barbara Keshen of the New Hampshire Civil Liberties Union about Student A's situation. McKaig provided Keshen with Student A's initials, age, and grade. McKaig and Keshen

also discussed Student A's potential privacy rights. Keshen's opinion was that the judicial bypass law protected the confidentiality of Student A's pregnancy and the fact that she was contemplating an abortion. McKaig relayed this opinion to Student A, and Student A made an appointment with a health center and another attorney to assist her with the judicial bypass proceedings.

On December 3, 2012, the principal instructed the school nurse to meet with Student A to tell her that the school would inform her mother about her pregnancy by December 5. That same day, McKaig told the principal about her conversation with Keshen and urged him to contact Keshen to discuss Student A's rights. The principal did not contact Keshen; however, on December 4, Keshen contacted him. He told Keshen that he had reviewed the parental notification and judicial bypass laws and determined that they did not prevent him from telling Student A's mother about the pregnancy.

Keshen instituted a petition for a temporary restraining order (TRO) against the principal in superior court to prevent the principal from contacting Student A's mother. McKaig was named as the petitioner "ON BEHALF OF [Student A]"; she was not named in her individual capacity. The petition did not include Student A's name. It instead referred to Student A by her initials and mentioned her age and grade, and that she was pregnant.

The district's attorney filed a special appearance on the principal's behalf, notifying the superior court that the principal would not inform Student A's mother about the pregnancy until the court held a hearing on the TRO petition. On December 10, Student A obtained a "judicial bypass order" from the superior court. The next day, the superior court granted the TRO petition.

Some four months later, on April 9, 2013, McKaig received a notice of nonrenewal from the superintendent; the notice did not advise her of the reasons for nonrenewal. McKaig subsequently requested a written statement of the reasons and a hearing before the local board under RSA 189:14-a (Supp. 2015). On May 24, 2013, the superintendent sent McKaig a statement of three reasons for her nonrenewal: insubordination, breach of student confidentiality, and neglect of duties. The record contains no indication that, prior to McKaig receiving the statement of reasons for nonrenewal, she was advised by any administration official that in connection with this matter she had been insubordinate, had breached student confidentiality, or had neglected her duties. After the hearing, the local board upheld McKaig's nonrenewal on the grounds of insubordination and breach of confidentiality, but not neglect of duties.

McKaig appealed to the state board, which found, pursuant to RSA 189:14-b, II (2008), that the local board's decision was "clearly erroneous." The state board reversed the local board's decision to uphold McKaig's nonrenewal, but it did not order McKaig's reinstatement or any other remedy. McKaig

moved for reconsideration in light of the board's failure to specify a remedy; the state board denied her motion. The district appealed the state board's decision to this court. McKaig cross-appealed, arguing that we should affirm the state board's decision except for its failure to provide a remedy. McKaig contends that she was entitled to reinstatement with back pay and benefits.

RSA chapter 541 governs our review of the state board's decision. See RSA 21-N:11, III (2012). Under RSA 541:13 (2007), we will not set aside the state board's order except for errors of law, unless we are satisfied, by a clear preponderance of the evidence, that it is unjust or unreasonable. See Appeal of Hillsborough County Nursing Home, 166 N.H. 731, 733 (2014). In reviewing the state board's order, our task is not to determine whether we would have found differently or to reweigh the evidence, but, rather, to determine whether the state board's findings are supported by competent evidence in the record. Id. We review the state board's rulings on issues of law de novo. Id. "The party seeking to set aside the [state] board's order bears the burden of demonstrating that it is clearly unreasonable or unlawful." Appeal of Hopkinton Sch. Dist., 151 N.H. 478, 480 (2004).

The district first argues that the state board committed an error of law by "failing to correctly apply the clearly erroneous standard of review required under RSA 189:14-b, II." (Quotation omitted.) According to the district, the state board instead impermissibly engaged in de novo review, "unlawfully reach[ing] its own factual conclusions based upon the evidence presented at the local school board level rather than determin[ing] whether the [local board's] decision was supported by the evidence." We disagree.

RSA 189:14-b, II provides that "[t]he state board of education shall uphold a decision of a local school board to nonrenew a teacher's contract unless the local school board's decision is clearly erroneous." RSA 189:14-b, II. As the district correctly notes, we have "yet to consider the clearly erroneous standard . . . in RSA 189:14-b, II." However, as to decisions by trial courts, we review a trial court's "factual findings as a mixed question of fact and law under the clearly erroneous standard. Findings of fact are clearly erroneous if unsupported by the evidence . . . . Our inquiry is to determine whether the evidence presented to the trial court reasonably supports the court's findings, and then whether the court's decision is consonant with applicable law." Taylor-Boren v. Isaac, 143 N.H. 261, 264 (1998) (quotation omitted). We note that nothing in RSA 189:14-b, II's text indicates that the legislature intended not to assign "clearly erroneous" its usual and customary meaning. Thus, the state board applies the clearly erroneous standard as stated in Taylor-Boren v. Isaac when reviewing the decisions of local school boards.

We hold that the state board did not err in its application of RSA 189:14-b, II's clearly erroneous standard. The state board's decision shows that it reviewed the record and found that the record did not reasonably support the

4

local board's conclusions that McKaig had been insubordinate or breached student confidentiality. Concerning insubordination, for example, the state board reviewed the district's policies cited by the local board and determined that the plain language of those policies did not require, among other things, that McKaig report to the superintendent before acting to prevent the principal from disclosing Student A's pregnancy. This conclusion was not a de novo factual determination. Rather, the state board accepted the local board's account of what McKaig did to assist Student A, but found clearly erroneous the local board's conclusion that McKaig's actions were inconsistent with district policy.

The district insists that the state board "unlawfully reached its own factual conclusions . . . rather than determine whether the [local board's] decision was supported by the evidence." The district argues that "de novo review is plainly evident in the conclusion section of [the state board's] decision, wherein it states that '[u]nder these particular circumstances, the record as a whole does not support a finding of insubordination or breach of confidentiality against McKaig.'" We fail to see how that statement in the state board's conclusion, which essentially mirrors our explanation of the clearly erroneous standard in Taylor-Boren, amounts to de novo review.

The district also points to several of the state board's allegedly impermissible factual conclusions, including that: "[t]here was nothing in the policy that required [McKaig] to appeal to the superintendent"; "the record reflected legitimate safety concerns"; "McKaig acted consistently with the policies and practices applicable to her role as guidance counselor"; and others. (Quotations omitted.) However, none of these conclusions evidence an impermissible de novo review. The first of the three is not a factual conclusion, but an interpretation of district policy, which interpretation is similar to a question of law. The clearly erroneous standard does not prohibit the state board's de novo review of the local board's interpretation of district policy. Cf. Taylor-Boren, 143 N.H. at 264 (including in the clearly erroneous standard an inquiry into not only "whether the evidence presented . . . reasonably supports the court's findings," but also "whether the court's decision is consonant with applicable law"). As to the remaining conclusions, the state board pointed to significant evidence in the record or defects in the local board's reasoning, which, according to it, supported its conclusions and rendered the local board's contrary conclusions clearly erroneous. This is precisely the nature of the review that RSA 189:14-b, II requires the board to conduct.

Next, the district argues that it was unjust and unreasonable for the state board to reverse the local board's decision. See RSA 541:13. In doing so, the district challenges both of the state board's conclusions: (1) that McKaig was not insubordinate; and (2) that McKaig did not impermissibly disclose Student A's confidential information. Mindful of the significant deference that

we owe the state board under RSA 541:13, we reject both of the district's challenges.

We hold that it was neither unjust nor unreasonable for the state board to rule that the local board's decision that McKaig was insubordinate was clearly erroneous. According to the local board, McKaig was insubordinate because she violated two school district policies: Policies 4244 and 4116. Policy 4244 states in part:

> The best [course] of action for an employee to take to avoid an insubordination issue is to follow the directive given by the supervisor, then later question or challenge the directive through dispute resolution. If an employee disagrees with a policy, regulation, rule, procedure and/or directive, or thinks it is unfair or unnecessary, the employee should discuss the issue with the Building Administrator.

The local board concluded that McKaig violated this policy by "disregard[ing] the principal's role as decision maker and go[ing] to court against him, rather than up the chain of command." However, the state board explained that Policy 4244 did not require going "up the chain of command," but only that McKaig speak "with the building administrator[, that is, the principal,] if there was a disagreement with his decision." (Quotation omitted.) The state board concluded that McKaig complied with Policy 4244 by "keeping the principal informed as to her actions and research on behalf of Student A[,] and urging him to contact" Keshen. The district argues that Policy 4244's reference to dispute resolution required McKaig to "attempt to resolve" her disagreement with the principal "above the level of [her] supervisor," that is, with the superintendent, rather than to file "a lawsuit in [s]uperior [c]ourt." Thus, the district argues, the local board's conclusion that "McKaig was insubordinate in violation of Policy 4244" was not clearly erroneous, and the state board was "unjust and unreasonable in deciding that there 'was nothing in the policy that required [McKaig] to appeal to the superintendent.'"

Contrary to the district's contention, the plain language of Policy 4244 does not require district employees to appeal their disagreements "up the chain of command." (Quotation omitted.) Although the policy mentions dispute resolution, it refers to it as the "best," not the only, course of action that an employee may take to "challenge [a] directive." Moreover, consistent with the state board's conclusion, the policy recommends that employees discuss policy disagreements with the building administrator, that is, the principal. Thus Policy 4244's text supports the state board's conclusion that, to avoid insubordination, McKaig was required only to discuss her disagreement with the principal, which she did. Moreover, the state board observed that "McKaig acted consistently with policies and practices applicable to her role as guidance counselor." Thus, the state board apparently recognized that McKaig had

6

professional obligations apart from her responsibilities as an employee. Accordingly, we conclude that it was neither unjust nor unreasonable for the state board to rule that the local board's application of Policy 4244 was clearly erroneous.

The state board also rejected as clearly erroneous the local board's conclusion that McKaig violated Policies 4244 and 4116 by failing to "follow and abide by the decision of" the principal to inform Student A's mother about her pregnancy. Policy 4244 refers to dispute resolution as a means of "challeng[ing] [a] directive." Policy 4116, in turn, provides in pertinent part that "[a]ll staff members will follow policies as outlined by the School District . . . and/or the directions of the Principal." The local board concluded that the principal's decision to inform Student A's mother about her pregnancy was a "directive" even though "it was not a direct order" to McKaig not to act on Student A's behalf. (Quotation omitted.) According to the local board, because McKaig disobeyed this directive by "cho[osing] to become a litigant against" the principal, McKaig violated Policies 4244 and 4116 and was therefore insubordinate. The state board determined that the record did not support the local board's finding that there was a directive because the principal never told McKaig "to cease her efforts on behalf of Student A, even when it became apparent that both she and the other guidance counselor disagreed with the principal's decision and that McKaig had already consulted with" Keshen. The district argues that the local board committed no clear error by finding that the principal's decision was a directive, which McKaig disobeyed, and, thus, the state board's conclusion that McKaig violated no directive was unjust and unreasonable.

The record supports the state board's conclusion that the principal did not give McKaig a directive. After McKaig told the principal about Student A's pregnancy, the principal did not tell McKaig to stop assisting Student A. The principal's next action was to direct the school nurse to have a discussion with Student A about her pregnancy. Because the principal never instructed McKaig not to act on Student A's behalf, it was neither unjust nor unreasonable for the state board to conclude that McKaig did not disobey a directive of the principal or that the local board's ruling that McKaig violated Policies 4244 and 4116 was clearly erroneous.

Next, the district argues that it was unjust and unreasonable for the state board to reject as clearly erroneous the local board's finding that McKaig breached student confidentiality. According to the local board, McKaig violated another provision in Policy 4116 by providing Student A's "confidential medical and identifying information" to Keshen and by allowing "that information's subsequent disclosure" in the TRO petition. The state board found that McKaig's disclosure was justified under an exception to the Federal Educational Rights and Privacy Act (FERPA), which, we note, is incorporated into Policy 4116 by reference. The state board explained that the exception

7

"permits release of confidential information under certain 'emergency' situations." See 20 U.S.C. § 1232g(b)(1)(I) (2012). The state board provided two additional reasons for its decision that the local board's ruling on confidentiality was clearly erroneous. However, the state board's reading of Policy 4116 alone supports its conclusion that neither McKaig's disclosure nor Keshen's inclusion of that disclosure in the TRO petition violated the confidentiality policy. Thus, we confine our discussion about confidentiality accordingly.

Policy 4116 provides in relevant part that "[a]ll employees are expected to keep personal information pertaining to pupils in confidence as required by the Buckley Amendment," that is, FERPA. The local board found that McKaig violated Policy 4116 by disclosing to Keshen Student A's initials, age, academic year, and pregnancy. The state board disagreed, and noted that FERPA permits the disclosure of confidential student information in emergency situations "if the knowledge of such information is necessary to protect the health or safety of the student or other persons." Id. (quotation omitted). The state board noted Student A's safety concerns, acknowledged that the local board failed to address those concerns or "whether . . . McKaig's actions were at least in accordance with the FERPA exceptions," and determined that "the record support[ed] a conclusion that they were."

We note that, in reversing the local board's decision, the state board was not interpreting or applying federal law. Rather, the state board's decision shows that, to the extent that it considered FERPA's provisions, it did so to determine the scope of Policy 4116's confidentiality provision. For this reason, we reject the district's argument that the state board erred in relying on FERPA's health and safety exception because FERPA applies to "educational agenc[ies] or institution[s]," not district employees, such as McKaig. This argument incorrectly assumes that the board was considering only FERPA, rather than Policy 4116, when analyzing McKaig's disclosure. Unlike FERPA, Policy 4116 applies to "[a]ll employees." It instructs employees to "keep personal information pertaining to pupils in confidence" in accordance with FERPA. When drafting Policy 4116, the district could have crafted its own student confidentiality rules and exceptions. Instead, it opted to incorporate by reference the rules and exceptions of FERPA, which include the health and safety exception that the board considered. Thus, FERPA's application to "educational agenc[ies] or institution[s]" is not controlling in our review of the board's decision. We instead focus on the board's interpretation of Policy 4116, which incorporates FERPA guidelines as the standard by which "[a]ll [district] employees" must manage confidential student information.

The record shows that in ruling that McKaig violated Policy 4116, the local board failed to consider FERPA or its exceptions. Because Policy 4116 incorporates FERPA, it was neither unjust nor unreasonable for the state board

8

to conclude that the local board's failure to address FERPA in its analysis of Policy 4116 was clearly erroneous.

Further, the record supports the state board's determination that Student A and "her boyfriend were afraid for their safety if [Student A's] mother found out" about her pregnancy.  Both McKaig and the other guidance counselor testified repeatedly about Student A's safety concerns.  The local board did not address this testimony specifically, but stated more generally that it did not base its decision on "what the witnesses who dealt with [Student A] claim she said at various points in time."  The local board appeared to conclude that these statements were irrelevant to the confidentiality issue, explaining that "[t]he statements attributed to [Student A] did not relate in any substantial way to the . . . issues supporting the acceptance of the Superintendent's recommendation," including the failure "to preserve the confidentiality of student information."  However, consideration of those statements was necessary to determine whether the health and safety exception, as incorporated into Policy 4116, permitted McKaig's disclosure.  The statements showed that McKaig disclosed limited information about Student A for the purpose of preventing the principal from informing Student A's mother about the pregnancy and thereby endangering Student A and her boyfriend.  Thus, it was neither unjust nor unreasonable for the state board to find clearly erroneous the local board's failure to consider that testimony as well as its ultimate conclusion that McKaig violated Policy 4116.

The dissent and the majority agree on one thing — this case is <u>sui generis</u>.  Our analysis is confined to the particular policies of the Farmington School District and their application to a unique set of facts.  In this narrow context, we conclude that, for the reasons stated above, the state board's interpretations of the policies were neither unjust nor unreasonable.  Although the dissent may interpret the policies differently, we decline to substitute our judgment for the state board's reasonable interpretations based upon its administrative expertise.  <u>See</u> <u>Appeal of Town of Seabrook</u>, 163 N.H. 635, 646 (2012) ("[W]e are reluctant to substitute our judgment for the expertise of administrative officials.").  Additionally, given the limited issues before us, we cannot accept the dissent's predictions about our decision's "frightening implications for the management of all collective organizations."  We also note that, contrary to what the dissent maintains, McKaig did not "sue her supervisor" because she "disagree[d] with his decision" about Student A.  She brought the TRO petition on behalf of a minor, who was granted significant rights by the New Hampshire legislature.  At no point during the superior court litigation did the district challenge McKaig's standing to bring suit on behalf of Student A, whose rights were at issue.  Moreover, we find it ironic, as well as concerning, that: the district asked the trial court to grant the requested TRO against it, which the trial court did and which the district did not appeal; and then, five months later, the district decided not to renew McKaig's employment based, in part, upon her filing of the TRO petition.

9

Apart from the unique circumstances giving rise to this case, there is nothing remarkable about our analysis; rather, it is based upon a reasoned application of legislative enactments, and employs well-established principles of judicial review, according proper deference to the state board's decision. We are disappointed by the tone of the dissent and its incorrect assumptions about our motivations. In contrast, we do not choose to speculate upon the motivations of the dissent; rather, after giving due consideration to the legal points raised by the dissent, we reject its substantive criticisms of our analysis.

Although the state board reversed the local board's decision not to renew McKaig's employment, it did not order a specific remedy. McKaig argues that she is entitled to reinstatement with back pay and benefits. The district does not deny that reinstatement would be a proper remedy in the event that we uphold the board's decision. However, it contests McKaig's entitlement to back pay and benefits.

RSA 189:14-b grants the state board the authority to review and reverse the decisions of local boards in nonrenewal matters. See RSA 189:14-b. However, the statute does not explicitly provide for a remedy in the event of a reversal. In two cases, we have discussed remedies for teachers who prevailed in nonrenewal matters. In Petition of Dunlap, 134 N.H. 533 (1991), we ordered the reinstatement of a teacher whose contract the school district had not renewed because of the teacher's many absences due to chronic asthma. Dunlap, 134 N.H. at 534-35, 543. McKaig cites Dunlap to support her argument that RSA 189:14-b "includes the power to reinstate a teacher." However, Dunlap did not so hold. Rather, in Dunlap, we held that the petitioner's nonrenewal on account of his asthma violated a statute that prohibited employment discrimination against the disabled. Id. at 539, 543. We ordered reinstatement on the basis of that statutory violation, but we did not explicitly connect the reinstatement remedy to RSA 189:14-b. Id.

In Littky v. Winchester School District, 129 N.H. 626 (1987), we awarded attorney's fees to a teacher who prevailed in a nonrenewal matter. Littky, 129 N.H. at 631. In doing so, we relied upon the "test we set out in Harkeem v. Adams, 117 N.H. 687, 377 A.2d 617 (1977), [stating that] where an individual is forced to seek judicial assistance to secure a clearly defined and established right, which should have been freely enjoyed without such intervention, an award of counsel fees on the basis of bad faith is appropriate." Id. (quotation and brackets omitted). We note, however, that here McKaig requests back pay and benefits, not attorney's fees.

We acknowledge, as did the district, that, without the ability to order reinstatement, the state board's authority to reverse a local board's decision not to renew a teacher or, in the instant case, a guidance counselor, would be meaningless. See RSA 189:14-b. We therefore affirm the state board's reversal of the local board's decision, and order that McKaig be reinstated to her former

10

employment.  We also remand to the state board the issue of whether McKaig is entitled to additional remedies, which issue should be addressed by the state board in the first instance.

Affirmed in part; reversed in part; and remanded.

DALIANIS, C.J., and CONBOY and BASSETT, JJ., concurred; LYNN, J., dissented.

LYNN, J., dissenting.  The majority's holding, that the State of New Hampshire Board of Education (state board) could have reasonably concluded that McKaig was not insubordinate, is based upon two flawed premises.  First, the holding is based upon the implicit (albeit unstated) determination that the principal's decision to disclose Student A's pregnancy to her parents was in some manner at least arguably unlawful or wrong.  Second, it also accepts that, because McKaig disagreed with the principal's decision to tell the parents, she had a right, not simply to advise the student of her disagreement with his decision, but to become an adversary in a court proceeding against him.  Neither of these premises, however, can withstand scrutiny.  Additionally, the majority allows the state board to impermissibly act as fact finder regarding McKaig's breach of Student A's right to confidentiality per district policy.  Had the state board given the required deference to the Farmington School Board's (local board) decision, it would have been required to uphold the decision not to renew McKaig's contract.  For these reasons, I respectfully dissent.

I

Given the majority's truncated recitation of the facts, I include the following facts that were presented to the local board at the two-day evidentiary hearing it held pursuant to RSA 189:14-a (Supp. 2015).  On November 26, 2012, Demetria McKaig and the other guidance counselor at Farmington High School met with Student A, a fifteen-year-old girl, and her boyfriend, who was nearly four years older.[1]  In that meeting, the counselors learned that Student A was pregnant and that she wanted to have an abortion.  According to

---

[1] At the hearing, there was a discussion about the fact that, because of Student A's age and legal inability to consent to sexual activity, her boyfriend likely had engaged in criminal conduct, and whether the school district had an obligation to report the conduct to the police.  The discussion indicated that the boyfriend's age was a few months short of that necessary to render his conduct a felony.  From this discussion, I infer that the boyfriend was slightly less than four years older than Student A.  Compare RSA 632-A:3, II (Supp. 2015) (sexual penetration with a person, not the actor's spouse, age 13 or older and under 16 constitutes class B felony "where the age difference between the actor and the other person is 4 years or more"), with RSA 632-A:4, I(c) (Supp. 2015) (sexual penetration with a person, not the actor's spouse, age 13 or older and under 16 constitutes class A misdemeanor "where the age difference between the actor and the other person is 4 years or less").

McKaig, the two "were very concerned [for] the boyfriend's safety if [Student A's] family found out, and that they were adamant they did not want [her] mother to know." Thereafter, McKaig began looking for services to help the student.

Later that week, at a meeting with select school staff including the principal, McKaig informed those present of Student A's disclosure and that she did not want to tell her mother. A conversation ensued about whether the parents[2] should be informed, and the principal inquired about how the school had handled similar situations in the past. The principal stated that he "felt strongly that, for the health and safety of that child, the parents need[ed] to know what was going on, both for her and the baby." The school nurse stated that she felt the parents should be notified, and indicated that she had done so on a prior occasion even though the student did not want the parent to know of the pregnancy.

Both guidance counselors opposed informing the parents. The other guidance counselor testified that she felt the principal was "personalizing," because he stated that he would want to know if his teenage daughter were pregnant. She also agreed that the two guidance counselors were the only two in the meeting who voiced opposition to telling the parents. Ultimately, the principal decided to wait until after the weekend to make a decision.

On Monday, December 3, the principal, after consulting with both the assistant superintendent and the assistant principal, asked the school nurse to meet with Student A, to see if she could convince the student to tell her parents. He asked the nurse to confirm with the student that she was, in fact, pregnant and to inform her that if she did not tell her mother by that Wednesday, the school would invite the parent in for a meeting to inform her. The nurse met with Student A, who "adamantly" denied being pregnant.

During this time, McKaig had contacted the American Civil Liberties Union of New Hampshire (ACLU), and received a copy of RSA 132:33 and :34 (2015), a statute requiring parental notification prior to a minor having an abortion and establishing the procedure for a so-called "judicial bypass" of such notification requirement under certain circumstances. McKaig forwarded the statute to the principal and tried to have him contact Attorney Barbara Keshen of the ACLU. The principal testified that he considered the statute, but determined that the statute concerned a minor having an abortion, and that he was only concerned about informing the parents of the pregnancy.

---

[2] It is unclear from the record whether Student A had more than one parent that was to be notified, but it does not matter for purposes of this case. I use "parents" in order to account for the possibility that Student A's biological father or other legal guardian may have been part of any notification by the principal.

McKaig, noting the lack of school district policy directly on point, also forwarded the principal additional research she had gathered about state and federal information on this issue. For instance, McKaig cited the New Hampshire Department of Education's website, which stated: "If a student discloses a pregnancy to a nurse or other school staff member, the issue of whether to inform the student's parent(s) is to be determined on a case-by[-]case basis at the local school level."

On December 4, Keshen called the principal and asked him if he had reviewed the parental notification statute. He indicated that he had, and that it did not change his mind about informing Student A's parents about the pregnancy. There was also testimony that both the superintendent and the assistant superintendent agreed with the principal's decision to tell the parents.

At around this same time, McKaig had a conversation with Keshen about potentially filing an emergency lawsuit in superior court. Keshen stated that she "felt that [she] was representing (Student A)" and not McKaig, but needed to use McKaig's name on the complaint. McKaig assented but stated that she wanted to speak with Student A first. Keshen testified that she did not speak with Student A and never received the student's authorization to file a lawsuit. Keshen also testified that she did not know Student A's reasons for not wanting to reveal her pregnancy to her family. McKaig gave Keshen the student's initials, age, and grade.

McKaig met with Student A during her lunch break and informed her of the principal's intentions. McKaig told the student that, in order to stop the principal from telling her mother, McKaig is "going to have to go to court," to which the student responded, "I don't want my mom to know." McKaig then stated "okay[,] [t]hank you[]" and "called [Keshen] and said go ahead."

That afternoon, Keshen filed a complaint in superior court seeking "a temporary and immediate order restraining [the principal] from informing the parents of [Student A] that she is pregnant." The only legal basis asserted in the complaint for granting such relief was that the principal would be in violation of the parental notification law if he informed the parents. Keshen testified that she did not review any district policies relating to this issue and that her entire approach was based upon her understanding of the judicial bypass provisions of the parental notification law. The complaint was captioned "DEMETRIA MCKAIG (ON BEHALF OF [Student A's initials])" versus the principal.

Upon receipt of the complaint, the principal contacted the school district administration. The superintendent, in turn, contacted Attorney Barbara Loughman, who filed a special appearance on behalf of the principal. Loughman informed the court that the principal agreed, pending a hearing, not

13

to notify the parents of Student A about her pregnancy. A hearing was then scheduled for December 11.

The court held a hearing regarding the restraining order on December 11. There, the parties learned that, the day before, the court had held a hearing on Student A's petition to have an abortion without notifying her parents and had granted a waiver of notification under RSA 132:34. Loughman testified that, upon being informed of the grant of the parental notification waiver, the school district did not challenge the request for a restraining order because there was no longer a health issue for the district to address with the parents. Loughman stated, "I basically said to the Court, please enter an order telling us that we can't tell the parent because, otherwise, . . . the District feels it has a responsibility to do so." The court issued an order "enjoin[ing] the defendant from making the disclosure to the parents, and order[ed] him to remind the members of the administrative team of the confidentiality requirements of RSA 132:34."

In April 2013, McKaig received a letter from the superintendent informing her that he would not be renominating her to her position for the following school year. Pursuant to her rights under RSA 189:14-a, McKaig requested the specific reasons for the nonrenewal and a hearing before the local board. In May, the superintendent sent McKaig a letter listing three reasons for her nonrenewal: (1) insubordination, stating that "[r]ather than follow the chain of supervisory authority within the school district in order to address a student matter, you chose to bring suit in Superior Court against your supervisory principal"; (2) breach of student confidentiality, stating "[i]n your handling of the student matter referenced above, you failed to keep personal student information private in violation of District policies and practice, and otherwise exercised poor judgment in disregard for District policies and practice"; and (3) neglect of duties, in part for failing to attend "special education team meetings concerning students for whom you are responsible."

Following a hearing, the local board accepted the superintendent's recommendation not to renew McKaig's contract, by a vote of 3-2. It did so on the bases that McKaig was insubordinate and breached Student A's confidentiality; it did not accept the recommendation based upon neglect of duties.

Pursuant to RSA 189:14-b (Supp. 2015), McKaig appealed the local board's decision to the state board. A state board hearing officer, after reviewing the record and the parties' arguments, recommended that the state board reverse the decision of the local board. The state board, after additional briefing and oral argument, adopted the recommendation of the hearing officer and reversed the local board's decision. This appeal followed.

## II

Before turning to the merits, I address the applicable standard of review. The majority correctly notes that, per RSA 189:14-b, the state board must uphold the decision of the local board unless it is clearly erroneous. This means that the local board's factual findings must be upheld unless "unsupported by the evidence." Taylor-Boren v. Isaac, 143 N.H. 261, 264 (1998) (quotation omitted). The majority recites this standard, but then goes on to say that it must determine whether the state board's findings are supported by competent evidence in the record. The majority never explains the "findings" it is referencing, but it must mean factual findings, as it acknowledges that rulings of law are reviewed de novo. However, the state board did not act as fact finder in this case.

It was the local board, not the state board, which held an evidentiary hearing in this matter. Before the state board hearing officer, as well as before the state board itself, the parties presented oral argument and briefing, but both sides relied upon a transcript of the hearing before the local board. One of the fundamental reasons we defer to the tribunal that saw and heard the evidence is "because a trial transcript provides no indication of a witness's tone of voice or demeanor, two useful tools in the assessment of credibility." State v. Giles, 140 N.H. 714, 718-19 (1996); see also State v. Gribble, 165 N.H. 1, 24 (2013) ("In contrast to the cold transcript received by the appellate court, the in-the-moment voir dire affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service." (quotation omitted)).

Because the state board had no basis for resolving disputed factual issues, its review of the local board's decision should have been confined to assessing whether the local board made an error of law or whether the evidence before the local board was insufficient to support the decision it reached. See Taylor-Boren, 143 N.H. at 264. Only upon one of these bases could the state board properly have found that the local board's decision was clearly erroneous. Nonetheless, without the benefit of the ability to appraise the "host of factors impossible to capture fully in the record — among them, [the witnesses'] inflection, sincerity, demeanor, candor, [and] body language," Gribble, 165 N.H. at 24 (quotation omitted), the state board reversed the local board's decision. The majority blesses the state board's action, purporting to defer to the state board's "administrative expertise" regarding the interpretation of the policies at issue here. Yet neither the matter of employee insubordination nor the matter of whether Student A had a legitimate fear of informing her parents requires any specialized knowledge or expertise about the operation or management of the school system. Nor do the issues here involve policies or regulations that have been repeatedly construed by the state board in a particular manner, such that they have become imbued with an administrative gloss that would be entitled to deference. See Petition of Kalar,

162 N.H. 314, 321-22 (2011). On the contrary, the state board's review of the local board's decision required nothing more sophisticated than an ability to read the straight-forward language of the school district's policies and the transcript of the hearing held before the local board. As discussed below, the record before us simply does not support the state board's "findings," which in reality amount to nothing more than the state board substituting its judgment for that of the local board.

III

Turning to the merits, I first discuss the majority's conclusion that the state board reasonably found the local board's decision that McKaig was insubordinate in violation of district Policies 4244 and 4116 to be clearly erroneous. To arrive at this conclusion, the state board and the majority endeavor to surgically parse the language of these policies in a manner that deprives them of any real meaning. For example, the majority asserts that Policy 4244 does not require an employee who disagrees with her superior's decision to go "up the chain of command" with her disagreement, but only that she speak with the building supervisor (here the principal); and that Policy 4116 was not violated because the principal never gave McKaig a specific directive "to cease her efforts on behalf of Student A." (Quotations omitted.) The obvious problem with these constructions is the negative implication which the state board and the majority seek to draw from the policies — that in the absence of a specific provision in the policies or specific statement from the principal saying that an employee who disagrees with her supervisor's decision on an issue within his authority to decide cannot sue to have the decision reversed, it was perfectly all right for McKaig to do so. The thesis that an employee who disagrees with her employer's business decision-making that does not infringe upon some personal right or interest of the employee[3] may <u>for that reason alone</u> file a lawsuit against the employer to change the decision without committing insubordination is a novel legal concept — and one that carries rather frightening implications for the management of all collective organizations, whether public or private, large or small.[4] Because the majority

---

[3] This would be an entirely different case if the principal's decision had adversely affected McKaig's rights or status as an employee of the school district. In that circumstance, she might well have been fully justified in challenging the decision by pursuing her rights under the collective bargaining agreement (CBA), including, if allowed by the CBA, initiating an action in court.

[4] The majority disputes that McKaig "sued her supervisor because she disagreed with his decision," insisting that instead she "brought a TRO petition on behalf of a minor, who was granted significant [but wholly undescribed] rights by the New Hampshire legislature." This is little more than an attempt to elevate semantics over substance. The fact is that McKaig was the named petitioner in the lawsuit, in the same manner that a parent or guardian would be the named party in a lawsuit brought on behalf of his or her child or ward who, because of age or incapacity, could not bring suit on his or her own behalf. Of course, the fact that McKaig was not Student A's parent or guardian, and therefore appears to have had no legal standing to act in her behalf, makes the lawsuit she brought all the more unprecedented. The majority notes that the school district did not challenge McKaig's ability to act on Student A's behalf. But lack of

16

cites no law and conducts no analysis supporting such a far-reaching legal proposition, it is fair to conclude that the majority does not genuinely ascribe to its validity and does not decide the case on this ground.

Instead, although the majority studiously avoids saying as much, the only plausible explanation for its holding is that the majority believes McKaig's action in suing her principal was not insubordinate because the principal's decision to tell Student A's parents about her pregnancy was not simply one with which McKaig disagreed, but was in some way wrongful or unlawful. Stated differently, if the principal was properly within his rights to tell the parents about the student's pregnancy, then it is hard to imagine how the majority could hold that it was not insubordinate for McKaig to participate in a lawsuit against the principal because she disagreed with that otherwise correct decision.

Indeed, the state board's ruling reveals that the claimed unlawfulness of the principal's decision to disclose Student A's pregnancy to her parents was the linchpin of its decision. The state board concluded that McKaig was not insubordinate because "she was acting under a reasonable belief that state law afforded the student certain privacy rights that prevented parental disclosure under the circumstances." The only ground offered by McKaig to support the supposed "unlawfulness" of the principal's intended disclosure is the claim that such disclosure would violate the judicial bypass provision of the parental notification law, RSA 132:34. There is, however, not even an arguable legal basis for this claim, and the local board thus was entirely correct in "reject[ing] the argument that notifying a parent would be a violation of RSA 132."

The parental notification law generally prohibits the performance of an abortion upon a minor until 48 hours after notice of the proposed abortion has been given to a parent of the minor. See RSA 132:33. RSA 132:34 creates a procedure, the so-called "judicial bypass," that permits a minor to have an abortion without notifying a parent by filing a petition in the superior court and obtaining a ruling by a judge that the minor either "is mature and capable of giving informed consent to the proposed abortion" or, if the minor is not mature, "the performance of an abortion upon her without notification of her parent . . . would be in her best interests . . . ." RSA 132:34, II. The statute also provides that "[p]roceedings under this section shall be held in closed court, shall be confidential and shall ensure the anonymity of the minor." RSA 132:34, II(b) (emphasis added). It continues that "[a]ll court proceedings under this section shall be sealed" and "[a]ll documents related to this petition shall be confidential and shall not be available to the public." Id.

<hr />

standing deprives a court of subject matter jurisdiction, a defect that cannot be remedied by consent or waiver. See Libertarian Party of New Hampshire v. Secretary of State, 158 N.H. 194, 195 (2008).

By its plain language, the statute imposes an obligation of confidentiality only with respect to the judicial bypass proceeding itself and any documents or filings related thereto. Nothing in the statute even remotely purports to establish some form of privilege that bestows upon a pregnant minor the right to preclude others who become aware of her pregnancy or her intended or completed abortion from sources outside the judicial bypass court proceeding (whether through voluntary disclosure by the minor or otherwise) from disclosing such information to others, including the minor's parents. Neither McKaig nor amicus ACLU offers the slightest developed argument suggesting how the text of RSA 132:34 could plausibly be construed to confer such a privilege. Yet the existence of such a phantom "pregnancy privilege" forms the entire underpinning of McKaig's appeal. And although the majority makes no explicit attempt to construe RSA 132:34 as creating such a privilege, it summarily concludes that Student A was "granted significant rights by the New Hampshire legislature." However, the majority never tells us what these rights are, in which statute they are located, or how they apply to the principal in this case. Therefore, we are left to guess that, through some wholly unarticulated methodology, the majority has somehow determined that the confidentiality provisions regarding the judicial bypass proceeding established by RSA 132:34 created a privilege which prevented a person uninvolved in that proceeding — the principal — from disclosing the pregnancy to the parents.[5]

Student A's disclosure to McKaig of her pregnancy was not part of the judicial bypass proceeding. Neither the principal nor the school district were parties to or had access to the bypass proceeding, which had not even been instituted at the time Student A made her disclosure to McKaig, nor does RSA 132:32 through :34 impose a requirement on Student A to speak with a school counselor (or anyone else, for that matter) as a prerequisite to invoking the judicial bypass procedure. If Student A did not want anyone to know she was pregnant or that she wished to have an abortion, she had it completely within her control to keep that information private and to anonymously invoke the judicial bypass procedure. Instead, she decided to voluntarily disclose her situation to her boyfriend and McKaig. I do not for a moment question the wisdom of that choice. But by disclosing her pregnancy to these individuals, she assumed the risk that they would make further disclosure of the information, including to her parents.[6] See generally Lewis v. United States,

---

[5] The legislature that passed a statute entitled "Parental Notification Prior to Abortion," and which established a confidential judicial proceeding by which the notice to parents that is normally required prior to performance of an abortion can be waived, will no doubt be quite surprised to learn that it also sub silentio created a privilege that prevents third parties not involved in the proceeding from notifying parents of their minor child's pregnancy.

[6] It is worth noting here that, unless he or she somehow becomes a part of the judicial bypass proceeding (by, for example, submitting an affidavit in support of — or in opposition to — the minor's claim that she is mature or that having an abortion is in her best interest), RSA 132:34 imposes no obligation of confidentiality on even the physician selected by the minor to perform the abortion. Rather, if such an obligation exists, its source must be found elsewhere, such as in the

385 U.S. 206, 210-11 (1966); State v. Valenzuela, 130 N.H. 175, 182-83 (1987). In particular, by disclosing her pregnancy and desire for an abortion to McKaig in her capacity as a school counselor and employee of the school district, Student A assumed the risk that the district would treat the information in accordance with school district policies and procedures.[7]

Aside from her unavailing reliance on RSA 132:34, McKaig makes no claim that there exists any other authority that precluded the principal from disclosing Student A's pregnancy to her parents. Based on the state board's observation that "McKaig acted consistently with policies and practices applicable to her role as guidance counselor," the majority confidently asserts that "the state board apparently recognized that McKaig has professional obligations apart from her responsibilities as an employee." (Emphasis added.) But of course the basis for such recognition is anything but apparent, given that the principal had the discretion to inform Student A's parents of her pregnancy and that the state board did not articulate the substance of any such "policies and practices" that authorized McKaig, through legal action or otherwise, to prevent the principal from doing so. In fact, the record reflects that the principal had the authority to do exactly what he proposed to do.

---

physician-patient privilege. See RSA 329:26 (2011); N.H. R. Ev. 503(a). Whether that privilege would impose an absolute bar against a physician disclosing a minor's pregnancy or intent to have an abortion to her parents, over the minor's objection, or, as with the school policies at issue here, grants the physician discretion to make such disclosure based upon his or her sound medical judgment, is a matter I leave for another day.

[7] In its amicus brief, the ACLU argues that "[i]nterpreting RSA 132:34 as protecting the confidentiality of a minor's pregnancy status is also correct as a matter of constitutional law." To the extent that the ACLU's argument could be construed as asserting that Student A had a constitutional right to protect her voluntary disclosure to McKaig by going to court to get an injunction against the principal, none of the cases cited by the ACLU support the existence of such a right. For the same reason, there is no basis upon which McKaig could reasonably have believed that the principal's disclosure to Student A's parents of the information Student A voluntarily disclosed to McKaig independently of the judicial bypass proceeding was unlawful, so as to support the thesis that McKaig's actions in bringing a lawsuit against the principal are protected, as the ACLU claims, by New Hampshire's Whistleblowers' Protection Act, RSA chapter 275-E (2010 & Supp. 2015). See RSA 275-E:2, I(a) (Supp. 2015). Not only is there an absence of legal authority supporting the ACLU's suggestion that Student A enjoyed a "constitutional right to privacy" in the circumstances of this case, but the implications of such a privilege would be quite breathtaking. Normally a constitutional right limits governmental action only. I am aware of no circumstance, however, where the constitution itself, as opposed to a statute or regulation, would prohibit either a governmental actor or a private actor from disclosing information voluntarily provided to it by the person claiming privacy protection. If such a privilege exists, does it apply only to McKaig, her principal, and the school district, or also to Student A's boyfriend and other friends to whom she may have disclosed her pregnancy (perhaps upon their express or implied "promise" to keep the information "secret")? Does the privilege prohibit only disclosure to Student A's parents, or disclosure to anyone as to whom she is afraid the disclosure will jeopardize her physical safety or emotional health (for example, by causing her embarrassment)? The First Amendment implications alone of a court having the ability to enjoin such disclosures are more than a little troubling, not to mention the due process implications of interfering with parents' ability to access information bearing on their minor child's welfare that the child has voluntarily disclosed to persons other than the parents.

19

As both McKaig and the other guidance counselor acknowledged in their testimony before the local board, the State Department of Education had information on its website regarding when a school administration should inform a student's parents that she is pregnant.  Both admitted that disclosure is not prohibited and that a decision to inform the parents must be made on a case-by-case basis at the local school level.  When confronted with this information, McKaig did not deny its applicability or that the principal's decision to disclose was one made "at the local school level," but, rather, maintained that the principal's decision "was against the law."  As discussed herein, however, McKaig was wrong — there is no law, policy, or other authority that would have prevented the principal from disclosing Student A's pregnancy to her parents.[8]

Absent some showing that the principal's decision was unlawful or wrongful, this case is no different than any other disagreement between a supervisor and an employee.  For example, had the principal made a lawful decision to suspend a student and McKaig disagreed with that determination, there would be no question that McKaig could not file a lawsuit against the principal to prevent the suspension.  Nonetheless, without any discussion of the lawfulness of the principal's decision, the majority upholds the state board by reasoning that McKaig was not insubordinate because she, by becoming a named party in a lawsuit against the principal, did not violate any "directive" given by the principal.  It states that "[b]ecause the principal never instructed McKaig not to act on Student A's behalf, it was neither unjust nor unreasonable for the state board to conclude that McKaig did not disobey a directive of the principal."  This is tantamount to holding that McKaig was not insubordinate because the principal never instructed her not to sue him if she

---

[8] The proposition that RSA 132:34 could be interpreted to bar the principal from disclosing Student A's pregnancy to her parents is at odds with the Child Protection Act, RSA chapter 169-C (2014 & Supp. 2015).  RSA 169-C:29 (2014) requires school officials and "any other person who has reason to suspect that a child has been abused or neglected" to report such abuse to the department of health and human services (DHHS).  RSA 169-C:32 (2014) abrogates "[the] privileged quality of [any] communication between . . . any professional person and his patient or client, except that between attorney and client," and provides that any such abrogated privileges "shall not constitute grounds for failure to report as required by this chapter."  Under the Act, an "[a]bused child" includes a child who has been "[s]exually abused," which in turn includes a child under 18 who has been "rape[d]."  RSA 169-C:3, II(a), XXVII-a (2014).  Because Student A was under age 16 and thus incapable of consenting to sexual intercourse, she was the victim of statutory rape, in violation of RSA 632-A:4, I(c), and the principal and school district presumably had an obligation to report this fact to DHHS.  Given that, upon receipt of such report, DHHS has an obligation to conduct a child protective investigation, see RSA 169-C:34, II (2014), and because it is wholly unrealistic to expect that DHHS could do so without Student A's parents becoming aware of the investigation, the privilege claim which McKaig and the ACLU advocate would effectively prevent DHHS from performing its statutorily imposed duties in circumstances in which a child under 16 does not desire his or her parents to know that he or she has been sexually active.  Needless to say, there is no basis whatsoever for interpreting RSA 132:34 to compel such a result in circumstances, such as exist here, where a mandatory reporter learns of the minor's sexual conduct independently of the judicial bypass proceeding.

20

disagreed with the decision that he made. However, a directive that a person cannot sue her supervisor when she disagrees with his decision should be so plainly evident to any reasonable person that it would be irrational to expect it to have been stated aloud. Yet, the majority's decision seems to require just that result.

I agree that Policy 4244 did not explicitly require McKaig to take her disagreement to the superintendent, but that she "should discuss the issue with the Building Administrator," and that the building administrator in this case was the principal. However, the only sensible reading of the policy in these circumstances is that it reflects the recognition that the principal had the final decision-making authority regarding the disclosure of the pregnancy and that there was no additional recourse for McKaig. Furthermore, even if the policy could be read to contemplate some implied ability for an employee to seek reconsideration of a decision within the hierarchy of the school district, it cannot reasonably be understood to incorporate a right to file a lawsuit against the building administrator.

The clear tenor of Policies 4244 and 4116, in proscribing insubordination, is completely consistent with the common and accepted meaning of the term, which is "defiance of authority." Webster's Third New International Dictionary 1172 (unabridged ed. 2002). In that regard, there is ample support in the record for the local board's finding that, by "cho[osing] to become a litigant" against her principal, McKaig was insubordinate in violation of these policies. The state board determined, without elaboration, that "[i]t is unclear from the record whether McKaig herself was familiar with the form the pleadings would take, or whether she was aware of or considered their potential adversarial effect." However, if there is anything about the decisions below that is clearly erroneous, it is this purported "finding" of the state board. Keshen testified at the local board hearing that she spoke with McKaig "to make sure that . . . [she] was aware that I was going to be putting her name on this petition because I didn't know the student's name" and that "before I would put someone's name on a petition, I would have a conversation with them about it." Keshen also testified that she informed McKaig that "there could be consequences for" McKaig being named in the lawsuit. Even McKaig admitted that she knew that Keshen was going to use her name. There is, in short, scant support for the thesis that McKaig did not appreciate what she was doing.

Moreover, the local board could readily have found that, even under McKaig's erroneous view that the principal's decision was "against the law," there was no justification for the way she chose to handle the matter. McKaig could have simply spoken with Student A, put her in contact with Keshen, and let the two discuss the student's legal options. However, McKaig did much more than that. She assumed an active role as adversary against her principal — so much so that, when Keshen filed the complaint in the superior court, she

did so based on McKaig's authorization and without ever having personally spoken to Student A in order to determine that the student consented to Keshen's representation or the filing of a lawsuit on her behalf. The local board quite understandably was skeptical that Keshen could have been "representing a minor student she had never met or talked to," testimony the local board reasonably found to be "quite incredible."

For all of the reasons discussed above, if the state board had afforded the proper deference to the local board, it would have been required to uphold the decision of the local board that McKaig was insubordinate according to the school's policy.

IV

I also cannot agree with the majority's holding that the state board sustainably determined that the local board's decision that McKaig breached her duty of confidentiality to Student A was clearly erroneous. Initially, I disagree with the majority's interpretation of Policy 4116. The majority holds that the policy's reference to the Federal Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g (2012), when stating that "[a]ll employees are expected to keep personal information pertaining to pupils in confidence as required by" FERPA adopted, for all employees, the health or safety exception described in FERPA. 20 U.S.C. § 1232g(b)(1)(I). It therefore concludes that the fact that FERPA is applicable only to "educational agenc[ies] or institution[s]" is irrelevant.

However, because FERPA applies only to "educational agenc[ies] and institution[s]," only those entities, not a school district employee acting against the wishes of the school administration, are permitted to disclose confidential information and rely upon the health or safety exception. To interpret Policy 4116 as allowing any employee individually to disclose confidential information regardless of the contrary view of the educational agency or institution as to the need for disclosure would mean that the district adopted a policy allowing for the violation of FERPA because it does not allow for such disclosure by individual employees. This interpretation makes little sense.

Even putting the interpretation of the policy aside, had McKaig truly been acting on behalf of Student A, one would think that McKaig would have simply obtained Student A's consent to disclose her confidential information to Keshen so that she could file the lawsuit. However, McKaig does not argue that Student A consented to the disclosure of her confidential information. Instead, the majority relies upon the FERPA health or safety exception mentioned in the policy to uphold the state board's decision. However, the state board's conclusion that there were legitimate safety concerns if Student

22

A's parents were notified of her pregnancy is perhaps the most obvious instance of it substituting its own factual findings for that of the local board.[9]

To be sure, there is testimony from both guidance counselors that Student A expressed a safety concern. However, the local board determined that it could not rely upon the statements of Student A, who did not testify, but whose statements were admitted as hearsay testimony through other witnesses. It determined that Student A "was, in all likelihood, very much inclined to say what she felt those she was dealing with wanted to hear when drawn into this situation."

The local board's finding that the hearsay statements of Student A are of questionable credibility is, contrary to the state board's conclusion, appropriately supported by the record in this case. For instance, when the principal instructed the school nurse to approach Student A, the student lied — "adamantly" denying being pregnant. Additionally, the superintendent testified that Student A informed the administration that McKaig had made the appointment for her at the Feminist Health Center, and both McKaig and the executive director of the center deny this, testifying that the student made the appointment herself. The local board's determination not to attribute much weight to the hearsay statements of Student A was undoubtedly well within its discretion as fact finder, and hardly constitutes clear error.

Nonetheless, the state board reasoned that "McKaig was privy to Student A's concerns and arguably in the best position to assess the safety issues regarding the family." It also states that "there is no dispute as to the legitimacy of these [safety] concerns." However, exploration of the record regarding these "safety concerns" reveals that, at best, the testimony reflects conclusory statements completely devoid of foundation, and, at worst, that they did not involve a safety concern with informing the parents at all.

Initially, neither the majority nor the state board discuss the substance of Student A's safety concerns. The majority simply reasons that both guidance counselors "testified repeatedly about Student A's safety concerns." This testimony consisted mostly of vague and unarticulated allegations of safety concerns without factual backup. Among these, McKaig testified that Student A and her boyfriend "were very concerned [for] the boyfriend's safety if the family found out." The other guidance counselor testified that the student "had safety concerns within her family," and that the family dynamic was "not a healthy environment and a safe environment." Neither guidance counselor provided any support whatsoever for these conclusory assertions. For

---

[9] To the extent the state board relied upon the safety concerns discussed in this section of the dissent as support for its conclusion that McKaig was not insubordinate, the discussion herein demonstrates that the state board had no basis for upsetting the local board's finding that such concerns provided no justification for her insubordinate conduct.

example, there was no testimony regarding the extent or nature of either counselor's prior dealings with the parents, evidence of a history of intemperate or abusive behavior by the parents toward Student A or other children of the parents, or any other details providing any objective basis for concluding that Student A's parents posed a genuine threat to her safety.

Perhaps most troubling is that, to the extent that the guidance counselors did offer anything more than the vague conclusions recited above, their testimony does not support a finding that Student A had a legitimate fear of her parents finding out that she was pregnant.  McKaig herself testified that "[t]he concern from the student was if the parent -- if the brother had found out the girl was sexually active with the boy."  (Emphasis added.)  The other guidance counselor also stated that, at the school staff meeting, "[w]e talked about there was a brother and so we did go into some detail about" the safety concerns within her family.

This testimony indicates that the purported safety concerns had nothing to do with the parents finding out that Student A was pregnant or potentially getting an abortion, but were concerns that her brother might have hurt her boyfriend if the brother found out that she was sexually active.  Based on this testimony, the local board could reasonably have found that the justification for McKaig's actions amounted to nothing more than a misguided subjective belief on her part that Student A's parents could not be trusted to handle the affairs of their own family, including controlling the behavior of their son.  Needless to say, such a subjective belief, which from all that appears was shared by no one in the school district hierarchy, cannot seriously amount to "legitimate safety concerns" justifying McKaig's breach of student confidentiality in order to prevent Student A's parents from learning of her pregnancy.

Furthermore, it bears repeating once again that, even if the local board credited McKaig's explanation for her actions, it still could have found that there was absolutely no reason for her to disclose to Keshen any identifying information regarding Student A.  Whatever concerns McKaig may have had about protecting Student A could have been fully satisfied, without any need for disclosure of such information to Keshen, by McKaig recounting her concerns to the attorney generically and then simply informing Student A of what she had been told by Keshen, giving the student Keshen's telephone number, and suggesting that she call Keshen if she wanted to pursue the matter further.

The majority observes that "[t]he state board provided two additional reasons for its decision that the local board's ruling on confidentiality was clearly erroneous."  Although it is true that the state board discussed two matters in addition to the "safety" rationale, it is not clear what significance the state board placed on these matters in arriving at its decision.  Nonetheless,

24

because, unlike the majority, I do not find the state board's reliance on the safety rationale persuasive, I briefly address these additional matters.

First, the state board appeared to fault the local board for not making an explicit finding as to whether the petition for a restraining order brought against the principal was automatically sealed at the time it was filed on December 4, 2012, or whether it was removed from the public record only when the court ordered that it be sealed on December 11, 2012. To support its decision that the local board did not make a finding on this point, the state board relied on the following sentence in the local board's decision: "[If] this information was not sealed until December 11, 2012, [Student A's] situation, and enough information to easily identify her was available to the public for a full week." (Emphasis in state board's ruling.) By focusing on the word "if" in this sentence, the state board concluded that the local board had merely <u>presumed</u> that the petition was an open public record for a period of one week. However, a reading of the local board's full discussion of this issue shows that the state board erred in construing the local board's decision in this manner. The local board specifically noted that there was conflicting evidence about when the petition was sealed. It determined that the testimony of Attorneys Loughman and Sanford Roberts (who represented Student A in the bypass proceeding) supported the conclusion that the petition was sealed only when the judge ordered it sealed on December 11, while Attorney Keshen's testimony "seemed to suggest" that the petition was automatically sealed when it was filed. After describing other aspects of Keshen's testimony that it found troubling, the local board found that it was "inclined on balance to put greater weight on the testimony of Ms. Loughman and Mr. Roberts on this point." Thus, despite its inartful use of the word "if" (seemingly as a proxy for "because" or for "accepting that") in the concluding sentence of its analysis of the matter, the local board's decision is amenable to the reasonable construction that, based upon its assessment of witness credibility, it determined that the petition was available to the public for one week before it was sealed. Because a reviewing tribunal must assume that the fact finder made all underlying findings necessary to support its ruling, see <u>In the Matter of Aube & Aube</u>, 158 N.H. 459, 466 (2009), and because this construction is both reasonable and supported by the evidence, the state board was required to accept the local board's decision on the matter under the deferential review of factual findings mandated by the clearly erroneous standard. See <u>Taylor-Boren</u>, 143 N.H. at 264.

The second matter discussed by the state board in the breach of confidentiality portion of its ruling concerned attorney-client privilege. The state board determined that Keshen "was bound by the attorney-client privilege and therefore prohibited from [redisclosing] the information" she received from McKaig about Student A. But the local board did not hinge its finding of a breach of confidentiality solely upon what Keshen <u>did</u> with the information she received (Student A's initials, age, grade, and the fact that she was pregnant).

25

Rather, the local board found that the breach of confidentiality occurred when McKaig disclosed this information to Keshen, who was not an employee of the school district, in the first place. Furthermore, contrary to what the state board apparently surmised Keshen's obligations to be regarding redisclosure of the information about Student A that she received from McKaig, it is undisputed that Keshen did in fact redisclose this information — to the court — when she filed the petition for the restraining order.

V

Given the deference the state board should have afforded the factual findings of the local board, and because the local board's findings were supported by the record, I would reverse the decision of the state board regarding both insubordination and the breach of Student A's confidentiality.[10]

The majority assures us that its decision is based upon "reasoned application of legislative enactments and well established principles of judicial review." In reality, however, the "reasoning and principles" relied upon by the majority are nowhere to be found. In particular, one searches the majority's opinion in vain for any analysis refuting the applicability of the Lewis-Valenzuela assumption-of-risk doctrine line of cases or the inapplicability of RSA 132:34 to the circumstances of this case. Whether the legislature should have created a privilege prohibiting school districts from disclosing to parents communications between a pregnant minor and school counselors concerning the pregnancy or possible termination of the pregnancy is a debatable point. What is not debatable is that the legislature did not do so; and neither the state board nor this court has the authority to decide this case as if the legislature had enacted such a privilege merely because the board or the majority of the court may believe that the legislature should have done so. Yet that, unfortunately, is the upshot of the majority's decision.

As will be obvious to anyone reading it who is at all versed in the law, today's decision is sui generis. It is hard to imagine another situation in which a court would hold that a subordinate employee does not commit misconduct by filing a lawsuit against a superior because of a disagreement with the

_____

[10] The majority "find[s] it ironic, as well as concerning . . . that the district asked the trial judge to grant the [temporary restraining order], and then, five months later, decided not to renew McKaig's employment based in part on" that order. However, the record does not support the conclusion that, by assenting to the trial court's order, the district agreed that the parental notification law prevented the principal from telling the parents. Rather, Loughman testified that the district was concerned about its potential liability to Student A's parents if it did not tell them about her pregnancy; and it seems clear from the context that, after learning that the trial court had already granted the waiver of parental notification in the bypass proceeding, the district agreed to the restraining order in the hopes that it would provide the district with legal "cover" against potential liability in the event it was sued by the parents. Although this strategy by the district may not have been particularly courageous, it hardly provides a retroactive justification for McKaig's conduct.

26

superior's work-related decision that is within the scope of the superior's authority, violates neither the law nor the policies of the employer, and has no adverse impact on the employee.  As such, the decision represents another example of the phenomenon of casting normal legal principles aside when courts are confronted with cases that implicate the hot button issue of abortion.  See McCullen v. Coakley, 134 S. Ct. 2518, 2545 (2014) (Scalia, J., concurring in the judgment) ("In its zeal to treat abortion-related speech as a special category, the majority distorts not only the First Amendment but also the ordinary logic of probative inferences.").  Because I cannot join the bandwagon of political correctness that provides the only justification for the majority's decision, I respectfully dissent.[11]

---

[11] The majority expresses its disappointment with the "tone" of the dissent and its "incorrect assumptions" about the majority's motivations.  The majority undoubtedly would prefer that my disagreements with its decision be set forth less bluntly, for then our differences could more readily be explained as a mere academic debate over some nice points of law.  However, the fact is that the majority's decision is not supported by any recognized body of established law or legal principles, but is instead an exercise of raw judicial power in the form of an opinion crafted ad hoc to produce the desired outcome.  It is understandable that the majority would be distressed when this is pointed out.  But its discomfort provides no justification for me to "sugar-coat" what has occurred.